## AFFIDAVIT OF U.S. POSTAL INSPECTOR JEFFREY M. POWERS

I, Jeffrey M. Powers, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a United States Postal Inspector currently assigned to the Boston Division Headquarters of the United States Postal Inspection Service ("USPIS"), where I have been employed since February 2019. Prior to being employed with USPIS, I was a Special Agent with the United States Postal Service ("USPS"), Office of Inspector General, for 14 years, and was an Assistant Special Agent-in-Charge for the last three years. During those last three years where I was the Assistant Special Agent-in-Charge, I supervised Special Agents and Task Force Officers in Puerto Rico who were investigating drug trafficking organizations using the United States mail. During my 16 years in federal law enforcement, I have investigated cases involving narcotics trafficking and distribution, bank fraud, wire fraud, money laundering and other federal crimes.

2.      I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 3061 and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 21 U.S.C. § 841(a)(1) and other federal offenses. I am also a federal law enforcement officer authorized by Rule 41 of the Federal Rules of Criminal Procedure to apply for federal search warrants.

3.      I am presently assigned to the Prohibited Mail-Narcotics Team. As a Postal Inspector assigned to the Prohibited Mail-Narcotics Team, my duties and responsibilities include, but are not limited to, the investigation of the illegal shipment of controlled substances and the proceeds from the sale of controlled substances, as well as the laundering of drug proceeds via the USPS. I have intercepted or participated in interdiction efforts resulting in the interception of over

of 50 Express/Priority Mail parcels that were found to have contained controlled substances or the proceeds from the sales of controlled substances.

4. I have received training in the areas of search and seizure, narcotics investigations, and criminal law. I have received training by the USPIS in the investigation of controlled substances and proceeds/payments for controlled substances being transported through the United States mails. I am also a 2007 graduate of the Drug Enforcement Administration ("DEA") Basic Narcotics Investigator Course, Quantico, Virginia.

5. I have participated in numerous investigations involving the transportation of controlled substances or proceeds/payments through the USPS. Many of these investigations have had national or international connections, and many required me to work closely and share information and intelligence with members of other law enforcement agencies, including the Federal Bureau of Investigation ("FBI"), the DEA, the Massachusetts State Police ("MSP"), and the police departments of local communities. I have debriefed, and continue to debrief, suspects, informants, and witnesses who have personal knowledge about the sale and distribution of narcotics, money laundering, and related crimes occurring in Massachusetts and nationally.

6. I have participated in the below-described investigation since February 2020. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

    a. My training and experience investigating drug-trafficking and money-laundering crimes;

    b. Oral reports, written reports, and documents that I have received from USPIS and other federal, state, and local law enforcement agents;

    c. Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

d.   Confidential sources of information;

e.   Public records;

f.   Business records;

g.   Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

h.   Precise location information for cellular telephones;

i.   The seizure of eight USPS parcels containing a total of approximately 16 kilograms of cocaine;

j.   Queries of law enforcement records and intelligence databases;

k.   Execution of search warrants and tracking warrants;

l.   Arrests of co-conspirators; and

m.   Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## **PURPOSE OF AFFIDAVIT**

7.     This affidavit is being submitted in support of a criminal complaint against the following individuals:

1)     Patrick JOSEPH ("JOSEPH");

2)     Donald CUE ("CUE");

3)     Night MENARD ("MENARD");

4)     Christian Junior ALVARDO-DELEON ("ALVARADO-DELEON");

5)     Oscar NIEVES-SOSA ("NIEVES-SOSA");

6)     Stiven BERRIO OSORIO ("BERRIO");

7)     Robert MONTEIRO ("MONTEIRO");

8)     Patrick SNOW ("SNOW"); and

9)      Felix BAEZ-MUNOZ ("BAEZ-MUNOZ")

(collectively, the "Target Defendants") charging that beginning at least in or about February 2020

and continuing until the present, each did knowingly and intentionally combine, conspire,

confederate, and agree with others known and unknown, to possess with intent to distribute and to

distribute cocaine and cocaine base, Schedule II controlled substances, in violation of 21 U.S.C.

§ 846.

8.      This affidavit is also being submitted in support of applications for search warrants

for the following Target Locations, which are described in greater detail below and in attachments

to the relevant warrant applications and warrants:

1)      85 Murray Circle, Stoughton, Massachusetts (hereinafter "JOSEPH's
residence," or "Target Location 1");

2)      1 Royal Crest Drive, Apartment 4C, Randolph, Massachusetts (hereinafter,
"MENARD's residence," or "Target Location 2");

3)      100 Liberty Place, Apartment 23E, Randolph, Massachusetts (hereinafter,
"ALVARADO-DELEON Residence" or "Target Location 3");

4)      100 Liberty Place, Apartment 13E, Randolph, Massachusetts (hereinafter,
"Target Location 4");

5)      22 Green Street, Right side, Randolph, Massachusetts (hereinafter,
"CUE's residence," or "Target Location 5");

6)      100 Highland Street, Apartment 2, Brockton, Massachusetts (hereinafter,
"AUGUSTIN's residence," or "Target Location 6");

7)      33 Davison Street, Apartment 1F, Hyde Park, Massachusetts (hereinafter,
"NIEVES-SOSA's residence" or "Target Location 7");

8)      1 Webster Avenue, Apartment 201, Chelsea, Massachusetts (hereinafter,
"BERRIO's residence" or "Target Location 8");

9)      91 Highland Street, Apartment 1, Brockton, Massachusetts (hereinafter,
"MONTEIRO's residence," or "Target Location 9");

10)     152 Spencer Street, Apartment 3, Dorchester, Massachusetts (hereinafter,
"ARCHIE's residence," or "Target Location 10");

4

11)    32 Merrymount Avenue, Apartment 8, Quincy, Massachusetts (hereinafter, "HACKETT's residence," or "Target Location 11"); and

12)    79 Peckham Street, Apartment 3, Fall River, Massachusetts (hereinafter, "HOPKINS' residence," or "Target Location 12");

(collectively, the "Target Locations"). For ease of reference, I have capitalized the names of individuals who are Target Defendants or residents of Target Locations. Further, I have attached an index of the principal paragraphs describing the probable cause as to each Target Subject and Target Location as Exhibit A.

9.    This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary to establish probable cause to believe that the Target Defendants identified herein have committed the above-described offense and that evidence, fruits, and instrumentalities of this offense will be found in the Target Locations as described below. All times referenced herein are approximate.

## SUMMARY OF INVESTIGATION

### A. General Background Concerning the Shipment of Drugs and Drug Sale Proceeds Through the United States Mails

10.    Experience and drug trafficking intelligence information gathered by the USPIS have demonstrated that USPS Priority Mail Express and Priority Mail are frequently used by drug traffickers for shipping drugs and the proceeds from drug sales. Use of Priority Mail Express and Priority Mail are favored because of the speed, reliability, free telephone and Internet package tracking service, as well as the perceived minimal chance of detection.

11.    In an effort to combat the flow of controlled substances through the United States mails, interdiction programs have been established in cities throughout the United States by the USPIS. These cities have been identified as known sources of controlled substances. The USPIS

conducted an analysis of prior packages that were found to contain drugs and drug proceeds. The analysis of prior packages that were found to contain drugs or drug proceeds indicated that these packages were usually sent from an individual to an individual. In the few cases when Express Mail or Priority Mail packages containing drugs or drug proceeds have displayed a business or company name, it was usually proven to be a fictitious business or company, or, in certain cases, a legitimate company whose name was being used without the knowledge or authorization of that business. Additionally, this analysis established a series of package characteristics that, when a package is found with a combination of two or more characteristics described below, have shown high probability that the package will contain a controlled substance or the proceeds of controlled substance sales. These characteristics include the following: (1) package was mailed from or addressed to a narcotic source city; (2) package has a fictitious return/sender address or name; (3) package has address information that is handwritten; (4) the handwritten mailing label on the package does not contain a business account number, thereby indicating that the sender paid cash; (5) package is addressed from an individual to an individual; and (6) package is heavily taped.

12. Based on my training and experience and USPIS intelligence, the characteristics described above are indicative of packages sent either by Priority Mail Express or Priority Mail that have been found to contain illegal controlled substances and/or the proceeds from drug sales. Packages bearing the majority of these characteristics are hereinafter referred to as "suspicious parcel(s)".

**B. Background of the Investigation**

13. Since February 2020, USPIS, along with federal, state, and local law enforcement officers, have been investigating a drug trafficking organization operated by JOSEPH. The investigation concerns the shipment of suspicious parcels suspected of containing kilograms of

cocaine through USPS from Puerto Rico to Massachusetts and Rhode Island. I know based upon my training and experience that Puerto Rico is a source location for cocaine. Investigators have seized eight of these suspicious parcels, each of which contained approximately two kilograms of cocaine, as established by forensic laboratory analysis of some of these seized parcels. Hereinafter, I will refer to the seized parcels as the "cocaine parcels." During this investigation, the majority of the seized cocaine was found concealed inside air fryers and locking cash boxes, which were inside the suspicious parcels. Based on an intercepted communication discussed further below, JOSEPH coordinates the transportation of 10-20 kilograms of cocaine at a time from the Dominican Republic to Puerto Rico, and eventually to Massachusetts and Rhode Island. JOSEPH's suppliers in the Dominican Republic and Puerto Rico ship each parcel with two kilograms of cocaine per parcel. Investigators have conducted extensive surveillance of the delivery and transportation of other suspicious parcels connected to this investigation. As further discussed below, on multiple dates, investigators have observed JOSEPH and members of the drug trafficking conspiracy parked near, observing, and circling the delivery addresses where suspicious parcels from Puerto Rico were delivered. Investigators have also observed members of the drug trafficking conspiracy take possession of the suspicious parcels after delivery and then transport the parcels to different locations where investigators have observed members of the drug trafficking conspiracy present.

14.     As detailed below, investigators have made several drug seizures during the course of the investigation and intercepted numerous communications of the Target Defendants discussing their drug trafficking activities. Based on the scope and long-term and regular drug trafficking activities of the Target Defendants, there is probable cause to believe that evidence of distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); the use of a communication facility in the commission of controlled substances

trafficking offenses, in violation of Title 21, United States Code, Section 843(b); conspiracy to commit controlled substances trafficking offenses, in violation of Title 21, United States Code, Section 846; and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 (collectively, the "Target Offenses") will be found in each of the Target Locations.

15.     Overall, based on the investigation, investigators believe the structure of the charged the drug trafficking conspiracy is as follows:

1)     JOSEPH – Leader of the JOSEPH Drug Trafficking Organization ("DTO")

2)     CUE – Principal drug distributor for the JOSEPH DTO

3)     MENARD – Drug distributor for the JOSEPH DTO

4)     ALVARADO-DELEON – Drug courier for the JOSEPH DTO

5)     NIEVES-SOSA – Drug courier for the JOSEPH DTO

6)     BERRIO – Customer and drug processer of the JOSEPH DTO

7)     MONTEIRO – Drug courier and customer of the JOSEPH DTO

8)     SNOW – Customer of the JOSEPH DTO and drug distributor

9)     BAEZ-MUNOZ – Drug and money courier for the JOSEPH DTO

**C.  Title III Electronic Surveillance**

16.     On March 15, 2021, United States District Judge Richard G. Stearns authorized the interception of wire and electronic communications to and from (617) 676-7827 ("Target Telephone 1") used by JOSEPH;[1] (646) 240-5295 ("Target Telephone 2") used by P. RINVIL[2]

---

[1] RINVIL informed his parole officer that JOSEPH uses Target Telephone 1, which is subscribed to by JOSEPH's paramour, C. McBrayer ("McBrayer"). Further, JOSEPH's bank account records list Target Telephone 1 as his telephone number.

[2] RINVIL is on parole following a manslaughter conviction resulting from a fatal shooting in New York. RIVINL provided his parole officer with Target Telephone 2 as his telephone number.

("RINVIL") (JOSEPH's brother); and (617) 504-8837 ("Target Telephone 3") used by CUE.[3] *See* 21-91169-RGS. Pursuant to this order, interceptions over Target Telephones 2 and 3 began on March 22, 2021 and terminated on April 20, 2021; interceptions over Target Telephone 1 began on March 23, 2021 and terminated on April 21, 2021.

17.     On April 28, 2021, United States District Judge Richard G. Stearns authorized the renewed interception of wire and electronic communications to and from Target Telephones 1 and 3. *See* 21-91169-RGS. Renewed interceptions over Target Telephones 1 and 3 resumed on April 29, 2021 and remain on-going today.

18.     Throughout the course of this investigation, investigators have obtained warrants to collect precise location information about the Target Telephones and other phones used by some of the Target Defendants, to use a cell-site simulator device to locate telephones, to install GPS devices on vehicles used by some of the Target Defendants, and to seize and search eight suspicious parcels sent from Puerto Rico, which have resulted in the seizure of approximately 16 kilograms of cocaine.

## PROBABLE CAUSE

19.     This section details the intercepted communications of, surveillance of, and drug seizures made from the Target Defendants in the charged conspiracy.  This section is divided into three parts:  Part I focuses on the Target Locations and the links to criminal activity at those locations; Part II focuses on surveillance of suspicious parcels retrieved by members of the JOSEPH DTO; and Part III focuses on intercepted communications and surveillance of some of the Target Defendants.

---

[3] CUE is the subscriber to Target Telephone 3, and his bank records list Target Telephone 3 as his telephone number.

20.     All of the intercepted communications detailed below have been summarized, but in many cases not yet been fully transcribed. The quotations from intercepted calls below are derived from summaries and/or preliminary transcripts. Some of the conversations are in Haitian Creole or Spanish and were translated by Haitian Creole-speaking and Spanish-speaking contract personnel to summaries and/or preliminary transcripts. Some of the pertinent conversations also include coded, cryptic, and/or slang language. For each of the calls discussed below, my interpretation of code words or other terminology, as well as my interpretations of the general substance of the calls, are based on my familiarity with this investigation and the collective training and experience of investigators in this case.

### Part I: Target Locations

### 85 Murray Circle, Stoughton, Massachusetts ("Target Location 1")

21.     85 Murray Circle, Stoughton, Massachusetts is a single-family residence, with gray siding and white trim. There is a paved driveway located to the left of the residence leading to a porch and door at the left side of the residence. The front door to the residence is yellow and the number "85" in black is affixed to the left of the front door of the residence.  There is also a back door to the residence and entry is gained from a back porch. A further description of Target Location 1 is found in Attachment A-1, which is attached hereto and incorporated herein by reference.

22.     As will be discussed below, I believe JOSEPH resides at Target Location 1 with McBrayer. McBrayer is listed as a signatory to JOSEPH's real estate company, CKP Dream Homes, LLC, registered to Target Location 1 with JOSEPH as the registered agent and receiving process at 49 Woolson Street, Mattapan, Massachusetts ("49 Woolson Street"). 49 Woolson Street

is owned by JOSEPH's family. Investigators have surveilled members of the JOSEPH DTO transport suspicious parcels into 49 Woolson Street from June 2020 to August 2020.

23.     JOSEPH's brother, RINVIL, reported to his parole officer that he was living with his brother, JOSEPH, at Target Location 1. Based on intercepted communications and surveillance, I believe that RINVIL had an argument with McBrayer and now resides at 100 Liberty Place, Apartment 13E in Randolph, Target Location 4. Further, a GPS device attached to JOSEPH's vehicle shows that it is regularly parked outside Target Location 1 during the overnight hours, including from May 18, 2021 to May 19, 2021.

### 1 Royal Crest Drive, Apartment 4C, Randolph Massachusetts ("Target Location 2")

24.     1 Royal Crest Drive, Unit 4C, Randolph, Massachusetts is an apartment in a multi-unit apartment building, with brick and beige siding. There are two doors to 1 Royal Crest Drive, front and back. Both doors are brown and the number "1" in gold is affixed above and in the middle of both doors to 1 Royal Crest Drive. Unit 4C is located on the lower level of 1 Royal Crest Drive. Once inside the building, the brown door to unit 4C does not have any identification on the apartment door. All 11 other units inside the building contain a unit number on their respective doors. Target Location 2 is the only apartment door in the building missing a label. Every apartment door at 1 Royal Crest Drive bears the apartment number, except for Target Location 2. A further description of Target Location 2 is found in Attachment A-2, which is attached hereto and incorporated herein by reference.

25.     RINVIL previously requested permission from his parole officer to reside at Target Location 2 and stated that his brother, JOSEPH, owned the residence. Property records for Target Location 2 do not list JOSEPH as the owner. Comcast subscriber records for Target Location 2 show that CUE's telephone, Target Telephone 2, is the listed subscriber contact number.

26.     Based on intercepted communications and surveillance discussed below, I believe that MENARD now resides at Target Location 2 and has resided there for approximately the past three months. Throughout this investigation, including on March 30, 2021, April 2, 3, and 7, 2021, May 13, 2021, and May 22, 2021, officers have observed one of MENARD's vehicles, registered to him, parked outside Target Location 2. On March 31, 2021, officers observed MENARD enter the building of Target Location 2. On April 2, 2021, officers observed MENARD walking a dog outside of Target Location 2 and then enter the building of Target Location 2 using a key. On April 7, 2021, officers observed MENARD enter the building of Target Location 2 using a key. On May 13, 2021, officers observed MENARD arrive outside Target Location 2 driving a vehicle registered to him at Target Location 2. As discussed below, investigators have intercepted communications that discuss MENARD living at Target Location 2.

27.     Investigators have surveilled members of the JOSEPH DTO transport suspicious parcels into the building of Target Location 2 from September 2020 to November 2020.

**100 Liberty Place, Apartment 23E, Randolph, Massachusetts ("Target Location 3")**

28.     100 Liberty Place, Apartment 23E, Randolph, Massachusetts is an apartment inside a multi-unit apartment building, with beige siding and white trim. The front door to Building 23 at 100 Liberty Place is white and glass. The number "23" in gold is affixed above the front door. Once inside Building 23, the doors to Apartments A-D are labeled. The black door to Unit E is the only door in the building not identified by a label. A further description of Target Location 3 is found in Attachment A-3, which is attached hereto and incorporated herein by reference.

29.     As will be discussed below, I believe ALVARADO-DELEON resides at Target Location 3. Comcast subscriber records show that the account holder for Target Location 3 is Taji Clark. As discussed below, investigators intercepted a call wherein JOSEPH informed CUE that

the property manager for Target Location 3 thinks JOSEPH's name is Taji.[4] The telephone number associated with the Comcast account at Target Location 3 is (929) 538-9803, and the user ID for the account is "cjalvarado15281803." Upon a review of the WhatsApp profile for (929) 538-9803, a photograph of ALVARADO-DELEON is depicted in the profile picture. Investigators have identified suspicious parcels addressed to Target Location 3 from December 2020 to May 2021. As will be discussed below, investigators have observed ALVARADO-DELEON and NIEVES-SOSA retrieve a suspicious parcel from the management office and bring it into the building of Target Location 3. Further, investigators have surveilled ALVARADO-DELEON coming and going from the building of Target Location 3 throughout this investigation, including on May 21, 2021.

### 100 Liberty Place, Apartment 13E, Randolph, Massachusetts ("Target Location 4")

30.     100 Liberty Place, Apartment 13E, Randolph, Massachusetts is an apartment in a multi-unit apartment building, with beige siding and white trim. The front door to Building 13 at 100 Liberty Place is white and glass, The number "13" in gold is affixed above the front door. Once inside Building 13, the black door to unit E is identified with the letter "E" in the center of the door in gold. A further description of Target Location 4 is found in Attachment A-4, which is attached hereto and incorporated herein by reference.

31.     As will be discussed below, I believe RINVIL now resides at Target Location 4. National Grid utility records show CUE is the account holder for Target Location 4. Based on intercepted communications and surveillance, I believe that CUE and JOSEPH control Target Location 4. Intercepted communications establish that CUE is allowing RINVIL to live at Target

---

[4] Investigators have surveilled the true Taji Clark retrieve suspicious parcels during this investigation.

Location 4 after RINVIL's argument with McBrayer. Investigators have observed CUE meeting with suspected drug customers at Target Location 4 on multiple occasions, including on May 21, 2021. As discussed below, and as a result of intercepted communications and surveillance, I believe that JOSEPH and CUE use Target Location 4 as a drug stash location.

### 22 Green Street, Right side, Randolph, Massachusetts ("Target Location 5")

32.     22 Green Street, Right Side, Randolph, Massachusetts is a two-family residence, with brick siding and white trim. There is a paved driveway located to the left and rear right of the residence. The front storm door to the residence is white and the second door is black. The number "22" is on the black mailbox to the left of the front door in white. There are also back doors to the residence. A further description of Target Location 5 is found in Attachment A-5, which is attached hereto and incorporated herein by reference.

33.     As will be discussed below, I believe CUE resides at Target Location 5. As discussed below, investigators have surveilled CUE at Target Location 5 at the same time as intercepted calls wherein CUE stated he was home. Investigators have surveilled CUE using the rear door that is circled in Attachment A-5 to access Target Location 5. Further, a GPS device attached to CUE's vehicle shows that it regularly parks outside Target Location 5 during the overnight hours, including from May 20, 2021 to May 21, 2021. As will be discussed below, intercepted communications and surveillance establish that CUE resides at Target Location 5 and leaves his residence to meet with suspected drug customers at Target Location 4.

### 100 Highland Street, Apartment 2, Brockton, Massachusetts ("Target Location 6")

34.     100 Highland Street, Apartment 2, Brockton, Massachusetts is an apartment in a multi-unit residence, with blue gray siding and white trim. The front storm door to the residence is white. The number "100" is above the front door in black. There is also a side door on the left

of the residence. A further description of Target Location 6 is found in Attachment A-6, which is attached hereto and incorporated herein by reference.

35.     As will be discussed below, I believe C. AUGUSTIN ("AUGUSTIN") resides at Target Location 6. AUGUSTIN receives mail at 100 Highland Street, Apartment 2 in Brockton, Target Location 6, and the mailbox for Target Location 6 bears his last name. Further, the Massachusetts Registry of Motor Vehicles lists his residence as 100 Highland Street, Apartment 2 in Brockton, Target Location 6. As will be discussed below, I believe that intercepted communications and surveillance established that CUE brokered a drug deal between AUGUSTIN and an unidentified male at Target Location 4 on May 6, 2021. After the drug deal, which I believe involved $12,000 worth of cocaine, AUGUSTIN returned to the building of Target Location 6.

### 33 Davison Street, Apartment 1F, Hyde Park, Massachusetts ("Target Location 7")

36.     33 Davison Street, Apartment 1F, Hyde Park, Massachusetts is an apartment in a multi-family residence, with off-white siding and white trim. There is a paved driveway located to the right of the residence.  The front door to the residence is brown. The number "33" is in the center of the two front doors in gold. A further description of Target Location 7 is found in Attachment A-7, which is attached hereto and incorporated herein by reference.

37.     As will be discussed below, I believe NIEVES-SOSA resides at Target Location 7. On April 14, 2021, NIEVES-SOSA used a telephone subscribed in his name at 33 Davison Street, Apartment 1F in Hyde Park, Target Location 7 to inquire about a seized cocaine parcel. Further, suspicious parcels have been mailed to 33 Davison Street, Apartment 1F in Hyde Park, Target Location 7. As discussed below, on March 5, 2021, NIEVES-SOSA retrieved a suspicious parcel addressed from Target Location 7, took it inside, and then discarded the USPS box outside Target Location 7 before taking the apparent contents of the suspicious parcel into Target Location 8.

Also discussed below, on May 21, 2021, investigators observed NIEVES-SOSA retrieve a suspicious parcel delivered to Target Location 7 and a second location then transport one of the suspicious parcels into Target Location 8 where agents believe cocaine is processed and diluted for re-distribution. The door that investigators observed NIEVES-SOSA use to access Target Location 7 is circled in yellow in Attachment A-7.

### 1 Webster Avenue, Apartment 201, Chelsea, Massachusetts ("Target Location 8")

38.     1 Webster Avenue, Apartment 201, Chelsea, Massachusetts is an apartment in a multi-unit apartment building, with beige and tan siding. The main entrance to the building is made of glass. There is also a set of rear glass doors. Once inside the main door, Apartment 201 is on the second floor and is identified with "201" in black affixed to the left of the black door to Apartment 201. A further description of Target Location 8 is found in Attachment A-8, which is attached hereto and incorporated herein by reference.

39.     As will be discussed below, I believe BERRIO resides at Target Location 8. As discussed below, video surveillance in the common hallway outside Target Location 8 has shown BERRIO coming and going from Target Location 8. On multiple occasions, from June 2020 to May 2021, BERRIO has opened the door to Target Location 8 for individuals to take suspicious parcels and the apparent contents of suspicious parcels into Target Location 8. Further, on March 5, 2021, BERRIO was observed carrying an air fryer box out of Target Location 8, consistent with the containers that concealed the cocaine in the cocaine parcels.

40.     The management office at Target Location 8 informed investigators that BERRIO rents Target Location 8. The management office was familiar with BERRIO because he rents Target Location 8 and identified him by name after reviewing a photograph of him. On May 18, 2021, investigators observed BERRIO carrying a case of baby formula into Target Location 8.

Based on my training and experience, baby formula is often used as a cutting agent to dilute cocaine. During this investigation, officers have never seen BERRIO with an infant or an infant coming and going from Target Location 8. The management office informed investigators that BERRIO does not have a child. I believe that BERRIO is processing and diluting cocaine in Target Location 8 for re-distribution.

### 91 Highland Street, Apartment 1, Brockton, Massachusetts ("Target Location 9")

41.     91 Highland Street, Apartment 1, Brockton, Massachusetts is an apartment in a multi-unit apartment building, with gray siding and white trim. Entry to the left side door to the building is gained through a side porch. Once inside the main door, Apartment 1 is on the first floor. A further description of Target Location 9 is found in Attachment A-9, which is attached hereto and incorporated herein by reference.

42.     As will be discussed below, I believe MONTEIRO resides at Target Location 9. MONTEIRO's vehicle is registered to him at Target Location 9. On April 10, 2021, investigators surveilled MONTEIRO return to Target Location 9 after meeting with JOSEPH at the suspected stash location at Target Location 4. As discussed below, on August 31, 2020, investigators observed MONTEIRO retrieve a parcel addressed to "Taji Clark" at Target Location 9. Investigators have also identified several suspicious parcels addressed to Target Location 9 between May 2020 and November 2020. As discussed below, investigators have intercepted communications between JOSEPH and MONTEIRO discussing their drug trafficking activities and have observed JOSEPH meet an individual outside the building of Target Location 9 on May 10, 2021 after MONTEIRO arranged to have someone let JOSEPH into Target Location 9 to retrieve cocaine.

17

## 152 Spencer Street, Apartment 3, Dorchester, Massachusetts ("Target Location 10")

43.     152 Spencer Street, Apartment 3, Dorchester, Massachusetts is an apartment in a multi-family residence, with yellow siding and brown trim. The front door to the residence is brown. The number "152" is located to the left of the front door in black.  Apartment 3 is on the third floor. A further description of Target Location 10 is found in Attachment A-10, which is attached hereto and incorporated herein by reference.

44.     As will be discussed below, I believe R. ARCHIE ("ARCHIE") resides at Target Location 10. According to the Massachusetts Registry of Motor Vehicles database, ARCHIE's residence is Target Location 10. Intercepted communications and surveillance have established that CUE supplied ARCHIE with cocaine at Target Location 10 on a regular basis between March 23, 2021 and May 19, 2021. Intercepted communications have also established that ARCHIE received complaints from his customers about the quality of cocaine that CUE provided in late March 2021.

## 32 Merrymount Avenue, Apartment 8, Quincy, Massachusetts ("Target Location 11")

45.     32 Merrymount Avenue, Apartment 8, Quincy, Massachusetts is an apartment in a multi-unit apartment building, with brick siding and white trim. The number "32" is affixed to the right of the white front door in silver numerals. Apartment 8 is on the first floor and is identified with the number "8" in black. A further description of Target Location 11 is found in Attachment A-11, which is attached hereto and incorporated herein by reference.

46.     As will be discussed below, I believe that K. HACKETT ("HACKETT") resides at Target Location 11. HACKETT receives mail at Target Location 11, and the mailbox at Target Location 11 bears his last name. Further, HACKETT is listed as the utilities subscriber to Target Location 11.

47.     As discussed below, on April 14, 2021, investigators observed HACKETT return to Target Location 11 and enter the front door of the building after obtaining drugs from CUE at Target Location 4. Further, intercepted communications and surveillance have established that HACKETT has regularly purchased cocaine from CUE and used a peer-to-peer payment system to pay CUE, including on May 21, 2021. On May 13, 2021, HACKETT described re-distributing cocaine to his "White friends."

### 79 Peckham Street, Apartment 3, Fall River, Massachusetts ("Target Location 12")

48.     79 Peckham Street, Apartment 3, Fall River, Massachusetts is an apartment in a multi-unit apartment building, with beige siding and white trim. The number "79" is affixed to the center of the tan door on the left side of the building in black numerals. Apartment 3 is on the third floor. A further description of Target Location 12 is found in Attachment A-12, which is attached hereto and incorporated herein by reference.

49.     As will be discussed below, I believe that S. HOPKINS ("HOPKINS") resides at Target Location 12. The Massachusetts Registry of Motor Vehicles lists HOPKINS as residing at 79 Peckham Street, Apartment 2, which is downstairs from Target Location 12. HOPKINS was convicted of drug trafficking and is currently on federal supervised release in the District of Massachusetts in case number 15-cr-10145-RGS. HOPKINS reported to his federal probation officer that he resides in Target Location 12.

50.     Based on intercepted calls discussed below, I believe that on April 20, 2021, HOPKINS called CUE and sent a third party, A. Willis ("Willis"), to obtain half a kilogram of cocaine from CUE. I believe that on May 11, 2021, HOPKINS sent Willis to pay CUE for the cocaine. After the meeting between CUE and Willis, investigators observed Willis return to 79

Peckham Street, Apartment 2. In the morning hours of May 24, 2021, investigators, using a cell-site simulator, located HOPKINS's telephone inside 79 Peckham Street, Apartment 2.

51.     In the evening of May 25, 2021, the uniformed officers went to 79 Peckham Street to better identify HOPKINS' residence. Officers knocked and spoke with the residents of 79 Peckham Street, Apartment 2. Officers did not recognize anyone in that apartment connected to this investigation. Officers knocked on the door of Target Location 12 and HOPKINS greeted officers at the door. Officers used a rouse that they were investigating a possible domestic disturbance and then departed the area.

**Part II: Surveillance of suspicious parcels retrieved by members of the JOSEPH DTO**

February 12, 2020: Two cocaine parcels seized and a third suspicious parcel surveilled by

JOSEPH

52.     In February 2020, Postal Inspectors identified two suspicious parcels ("Parcel #1" and "Parcel #2"). Both parcels were sent on February 10, 2020 from Puerto Rico to Massachusetts. Both parcels bore a handwritten label, and postage for each was paid in cash.  Both parcels weighed slightly more than eight pounds.  The parcels were addressed for delivery to residences in Methuen and Lowell, Massachusetts. Investigators obtained and executed search warrants for Parcels #1 and #2 on February 12, 2020. *See* 20-mj-6080-6081-MPK. From each parcel, a Postal Inspector seized approximately two kilograms of a compressed white powdery substance that field-tested positive for cocaine.

53.     After reviewing USPS records, I identified a third USPS Priority Mail parcel that was also sent from Puerto Rico to Massachusetts on February 10, 2020 ("Parcel #3"). Parcel #3 bore many characteristics common to Parcel #1 and Parcel #2. Parcel #3 was sent from the Canovanas, Puerto Rico Post Office 00729, which is 15 miles from where Parcels #1 and #2 were

mailed. Like Parcels #1 and #2, Parcel #3 also bore a handwritten label, Parcel #3's postage was paid for in cash, and Parcel #3 weighed slightly more than eight pounds.

54.     Parcel #3 was addressed to, "David Kimball, 284 Weymouth St, Holbrook MA 02343." From my review of Clear, a law enforcement database, and open-source internet searches, I determined that 284 Weymouth Street in Holbrook, Massachusetts was a valid address; however, I could find no information indicating that the listed recipient ("David Kimball") was associated with that address. During this investigation, officers intercepted calls wherein Kimball asked JOSEPH and CUE for bail money in an unrelated case. As will be later discussed, another cocaine parcel was mailed to one of JOSEPH's properties in a variant spelling of Kimball's name.

55.     During my review of USPS records, I also determined that there was a relationship between Parcels #1, #2, and #3: namely, that on February 11, 2020, at 4:38 p.m. (CST), an individual using a device with the same Internet Protocol ("IP") address accessed the USPS Track and Confirm website to check on the delivery status of each parcel. Given Parcel #3's relationship to Parcels #1 and #2, I believe that Parcel #3 also contained cocaine.

56.     Parcel #3 was scheduled for delivery on February 14, 2020. On that date, prior to the delivery of the parcel, investigators established surveillance in the area of 284 Weymouth Street in Holbrook, Massachusetts, the delivery address for Parcel #3. At 12:30 p.m., a USPS employee delivered Parcel #3 to the residence and left the parcel in plain view by the front door.

57.     At seven different times between 1:30 p.m. and 4:45 p.m., surveillance officers observed a gray Silverado (hereinafter, the "gray Silverado") drive slowly up and down Weymouth Street past the residence where Parcel #3 was visible by the front door. On each occasion, surveillance officers observed two black males inside the gray Silverado, later identified as JOSEPH and RINVIL. Both JOSEPH and RINVIL appeared to be looking around the surrounding

area doing counter-surveillance (*i.e.*, looking for any signs of law enforcement). The last time that officers observed the gray Silverado drive past 284 Weymouth Street was at 4:45 p.m. Two minutes later, at 4:47 p.m., officers observed a black Suburban (the "black Suburban") park in front of the residence at 284 Weymouth Street. As discussed below, investigators stopped BAEZ-MUNOZ after observing him driving the black Suburban at a later date.[5] An unidentified male exited the passenger side of the black Suburban and walked to the front of the residence at 284 Weymouth. Moments later, surveillance officers observed the unidentified male walking back from the residence at 284 Weymouth Street carrying what appeared to be Parcel #3. The male got into the black Suburban with the parcel, and the black Suburban then drove away. Less than five minutes later, a surveillance officer drove past the residence at 284 Weymouth Street and determined that Parcel #3 was no longer visible by the front door.

58.    At 4:50 p.m., surveillance officers observed the black Suburban stopped at a red light at the intersection of Weymouth Street and Pine Street. This intersection is approximately one-tenth of a mile from 284 Weymouth Street. The gray Silverado followed directly behind the black Suburban as both vehicles left the area. During the course of surveillance, investigators were able to view JOSEPH as the driver and RINVIL as the front seat passenger in the gray Silverado.

59.    Based on my knowledge, training and experience, I know that experienced drug traffickers will often repeatedly drive past the delivery address where a parcel containing controlled substances has been delivered to determine whether law enforcement is surveilling the package or attempting to do a controlled delivery and arrest. I also know that experienced drug

---

[5] Investigators also observed BAEZ-MUNOZ retrieve suspicious parcels driving the black Suburban on dates including February 7, 2020, February 24, 2020, March 16, 2020, and April 30, 2020.

traffickers will often arrange for other individuals to receive and transport parcels containing drugs, and that the drug traffickers will often use a separate vehicle that closely follows the parcel to monitor the progress of the drug-carrying vehicle. For the following reasons, I believe that the movements of the gray Silverado were consistent with this behavior: (a) JOSEPH and RINVIL engaged in approximately three-hours' worth of counter-surveillance in the vicinity of 284 Weymouth Street after Parcel #3 was delivered; (b) almost immediately after the gray Silverado's seventh drive past 284 Weymouth Street, the black Suburban appeared and an individual retrieved Parcel #3 and carried it back to the black Suburban; and (c) the black Suburban then left the area with the gray Silverado following the vehicle.

60.     On March 4, 2020, an MSP Trooper participating in the investigation observed the gray Silverado engage in a moving violation while in Randolph, Massachusetts. The Trooper stopped the vehicle and asked the operator for identification. The operator identified himself as RINVIL. RINVIL stated that the vehicle belonged to his brother, whom he stated was JOSEPH. RINVIL informed the Trooper that he lived at Target Location 1. As discussed above, RINVIL has since moved from Target Location 1 to Target Location 4.

61.     RINVIL is currently on parole. According to RINVIL's parole officer, RINVIL is currently on electronic monitoring. GPS data for RINVIL's electronic monitoring device showed that RINVIL was in the area of 284 Weymouth Street, Holbrook, Massachusetts, on February 14, 2020, during the times that surveillance officers observed the gray Silverado in the area on that date. GPS data for RINVIL's electronic monitoring device also showed that after Parcel #3 was

retrieved from 284 Weymouth Street, RINVIL travelled to the area of Target Location 2, which is a suspected stash location for the JOSEPH DTO.[6]

<u>April 30, 2020: Seizure of a cocaine parcel in an air fryer</u>

62.     On April 30, 2020, I sought and obtained a search warrant for another suspicious parcel ("Parcel #8"). *See* 20-mj-6305-MPK. Parcel #8 was sent from the Juan Diaz, Puerto Rico Post Office on April 27, 2020. Parcel #8 weighed approximately 20 pounds, 3 ounces; it bore a handwritten label; and postage was paid for in cash. Parcel #8 bore a return address of "Michael Ramirez, B.O Galicia Calle Principal Casa 69, J.D 00795," and was addressed to "Manuel Ramirez, 107 Arlington St. Apt 2, Lawrence Ma 01841." Based upon my review of USPS databases and Clear, I determined that the return address did not appear to be a valid address, and that no one named "Manuel Ramirez" appeared to be associated with the delivery address. Parcel #8 contained an air fryer. Hidden inside the air fryer were two plastic-wrapped, brick-shaped bundles of a white compressed powder, both of which field-tested positive for cocaine and weighed approximately one kilogram each. Investigators have seized other cocaine parcels that concealed cocaine inside air fryers and have observed members of the JOSEPH DTO transporting air fryer boxes and discarding air fryer packaging, including on January 23, 2021. As discussed below, investigators have observed NIEVES-SOSA transporting air fryer boxes into Target Location 8 on March 5, 2021.

<u>May 15, 2020:  JOSEPH conducted counter-surveillance around the time of delivery of two suspicious parcels</u>

63.     On May 14, 2020, I identified two suspicious parcels ("Parcels #12 and #13") that had been sent from Puerto Rico and were en route to addresses in Dorchester and Mattapan,

---

[6] Throughout this investigation, investigators have observed suspicious parcels transported to Target Location 2 from September 2020 to November 2020.

Massachusetts. Parcel #12 was sent from the Sabana Grande, Puerto Rico Post Office on May 12, 2020.  Parcel #12 weighed approximately 19 pounds, 15 ounces; it bore a handwritten label; and postage was paid for in cash.  Parcel #12 bore a return address of "Carlos Clark, Urb. Colinas de Valle Rosa, Calle 3 Casa 34 Sabana grande, P.R 00637," and was addressed to "Taji Clark, 10 Ripley rd Dorchester, MA 02121." Based upon my review of USPS databases and Clear, I determined that the return address did not appear to be a valid address, and that no one named "Taji Clark" appeared to be associated with the delivery address. Investigators have intercepted communications between JOSEPH and CUE discussing Taji Clark.

64.     Parcel #13 was sent from the Yauco, Puerto Rico Post Office on May 12, 2020. Parcel #13 weighed 20 pounds; it bore a handwritten label; and postage was paid for in cash.  Parcel #13 bore a return address of "Albert Sims, HC 02 Box 8947, Yauco P.R 00698," and was addressed to "Latrona Sims, 805 Morton St Apt 3, Mattapan ma 02126."  Based upon my review of USPS databases and Clear, I determined that the return address did not appear to be a valid address, and that no one named "Latrona Sims" appeared to be associated with the delivery address. Investigators have intercepted communications between JOSEPH and Latrona Sims, a/k/a Trona Sims.

65.     Both Parcels #12 and #13 were scheduled to be delivered on May 15, 2020, At 10:04 a.m., data from the GPS device attached to the gray Silverado, indicated that the gray Silverado was parked in the area of the delivery address for Parcel #12 (10 Ripley Road, Dorchester, Massachusetts) and remained there for approximately eleven minutes.[7]

---

[7] A tracking warrant was issued for the gray Silverado in 20-mj-6072-MPK and extended eight times.

66.     At 10:27 a.m., surveillance officers observed a gray Honda SUV (the "gray Honda SUV") parked directly in front of the delivery address for Parcel #12 (10 Ripley Road, Dorchester, Massachusetts). An unidentified Black female ("UBF1") was sitting in the driver's seat of the gray Honda SUV.

67.     At 10:40 a.m., a USPS letter carrier arrived with Parcel #12 at the delivery address (10 Ripley Road, Dorchester, Massachusetts). I later learned from the USPS letter carrier that as he approached the delivery address with Parcel #12, UBF1 in the gray Honda SUV inquired whether he had the parcel "for number 10." The USPS letter carrier reported that he responded affirmatively and was instructed by UBF1 to leave Parcel #12 on the sidewalk next to the gray Honda SUV. The USPS letter carrier scanned Parcel #12 as delivered and left the parcel on the sidewalk as instructed.

68.     At 11:03 a.m., data from the GPS device attached to the gray Silverado indicated that the Silverado stopped in the area of the delivery address for Parcel #13 (805 Morton Street, Mattapan, Massachusetts). At 11:06 a.m., I observed the gray Silverado backed into a driveway across the street from the delivery address for Parcel #13. The Silverado departed the area several minutes later.

69.     At 11:07 a.m., surveillance officers observed the gray Honda SUV leave the area of the delivery address for Parcel #12. A short while later, surveillance officers confirmed that Parcel #12 was no longer on the sidewalk. Surveillance officers observed that the gray Honda SUV was closely followed by a white Audi SUV (the "white Audi SUV"). Surveillance officers followed the two vehicles to the apartment complex of Target Location 2, where they parked.

70.     At 11:27 a.m., surveillance officers observed the gray Silverado pull into the parking lot of Target Location 2 and park near the gray Honda SUV and white Audi SUV. At 11:34 a.m., the gray Honda SUV departed the area of Target Location 2.

71.     At 11:40 a.m. on May 15, 2020, investigators established surveillance in the area of the delivery address for Parcel #13 (805 Morton Street, Mattapan, Massachusetts). At 12:25 p.m., a USPS letter carrier arrived at the delivery address and delivered Parcel #13 to the porch of the residence.

72.     At 1:15 p.m., surveillance officers observed two other unidentified Black males enter the residence at 805 Morton Street. One of the two males was carrying a parcel consistent in size and shape to Parcel #13.

73.     At 1:43 p.m., surveillance officers observed the gray Silverado, being driven by JOSEPH depart the parking lot of Target Location 2. Data from the GPS device attached to the Silverado indicated that the Silverado arrived and parked in the area of 49 Woolson Street, at 2:00 p.m. 49 Woolson Street is a short distance from the delivery address of Parcel #13. At 2:10 p.m., surveillance officers then observed the white Audi SUV parked in front of 49 Woolson Street. Investigators were unable to see if the white Audi SUV went to 805 Morton Street.

74.     Based upon my training and experience, as well as my participation in this investigation, I believe that JOSEPH used the gray Silverado to conduct counter-surveillance at the delivery addresses before the delivery of parcels containing cocaine from Puerto Rico, and that JOSEPH then arranged for co-conspirators in the gray Honda SUV and white Audi SUV to pick up the cocaine parcels and deliver Parcel #12 to Target Location 2 and Parcel #13 to 49 Woolson Street.

May 21, 2020:  One day after JOSEPH met with BAEZ-MUNOZ, agents in New York seized

$387,030 of suspected drug proceeds from BAEZ-MUNOZ

75.     On May 20, 2020, at 11:48 a.m., pen register data showed that Target Telephone 1, used by JOSEPH, received a 20-second incoming call from telephone number (646) 371-3578, believed to be used by BAEZ-MUNOZ.[8]  Hereinafter, I will refer to telephone number (646) 371-3578 as "the BAEZ-MUNOZ Telephone." At 11:49 a.m., Target Telephone 1 received a 32-second incoming call from the BAEZ-MUNOZ Telephone.

76.     At 2:20 p.m., data from a GPS device attached to the black Suburban indicated that the black Suburban had parked in the area of Target Location 2.[9]  Investigators were able to access video surveillance at that location to surveil the black Suburban.

77.     At 2:22 p.m., BAEZ-MUNOZ exited the black Suburban and walked through the parking lot into the apartment complex empty-handed. Pen register data indicated that at 2:23 p.m., the BAEZ-MUNOZ Telephone placed a 16-second call to Target Telephone 1. Approximately one minute later, Target Telephone 1 placed a 21-second call to the BAEZ-MUNOZ Telephone. I believe that BAEZ-MUNOZ and JOSEPH communicated so that BAEZ-MUNOZ could meet with JOSEPH and retrieve drug proceeds that would later be seized in New York, as discussed below.

78.     Investigators reviewing surveillance camera footage at the apartment complex observed BAEZ-MUNOZ, at 2:52 p.m., walk away from Target Location 2 through the parking lot to the black Suburban, carrying a green backpack over his right shoulder. At the same time,

---

[8] According to law enforcement records, on January 2, 2020, investigators, while preparing to execute an unrelated federal search warrant in Hyde Park, Massachusetts, encountered BAEZ-MUNOZ. BAEZ-MUNOZ identified himself to the investigators and provided them with his telephone number, (646) 371-3578.

[9] A tracking warrant was issued for the black Suburban in case 20-mj-6274-MPK and extended once.

surveillance officers observed JOSEPH walk through a courtyard outside Target Location 2 and into the parking lot.

79.     The following day, on May 21, 2020, in the morning hours, investigators reviewed footage from a pole camera across the street from BAEZ-MUNOZ's residence in Methuen, Massachusetts. Investigators observed BAEZ-MUNOZ exit his residence at 5:53 a.m. BAEZ-MUNOZ was carrying a large black duffle bag and a gray backpack strapped on his back. BAEZ-MUNOZ walked out of view of the pole camera in the direction of the black Suburban, which was parked on Prospect Street near the residence.  A short time later, data from the GPS device attached to the black Suburban indicated that the vehicle was in transit. Data from the black Suburban indicated that the black Suburban drove directly from Massachusetts to the Bronx, New York.

80.     At 10:00 a.m., law enforcement officers in the Bronx, New York, observed BAEZ-MUNOZ exit the black Suburban with a large black duffel bag and a gray backpack. The officers approached BAEZ-MUNOZ and identified themselves. The officers asked BAEZ-MUNOZ what was in the bags. BAEZ-MUNOZ informed the officers that the bags contained clothes. The officers asked BAEZ-MUNOZ if they could open the bags and review their contents. BAEZ-MUNOZ then consensually opened the black duffel bag and showed the officers that the bag contained cash. BAEZ-MUNOZ initially told the officers that he had picked up the cash in Brooklyn and had been directed to deliver the cash to the Bronx. Later, BAEZ-MUNOZ stated that he had picked up half the cash in Providence, Rhode Island, and the other half in Brooklyn at approximately 5:00 a.m. Officers seized $387,030 in cash from the large black duffle bag, as well as a ledger bearing the date "May 21, 2020" and listing names and monetary amounts written in Spanish. BAEZ-MUNOZ was released from the scene.

81.    Based on my training and experience, as well as my participation in this investigation, I believe that BAEZ-MUNOZ, acting on JOSEPH's behalf, was in the process of delivering the proceeds from the sale of cocaine to individuals in the Bronx, New York for the purpose of either paying for previously-delivered shipments of cocaine and/or securing additional shipments of cocaine. I also believe that JOSEPH used Target Telephone 1 to communicate and coordinate a meeting with BAEZ-MUNOZ concerning this delivery of drug proceeds to New York. Following BAEZ-MUNOZ's stop in New York, investigators have not seen him in this investigation and the black Suburban was abandoned in New York for several weeks. The black Suburban was sold in November 2020.

<u>June 8, 2020:  JOSEPH was at a delivery address for two suspicious parcels from Puerto Rico shortly after the parcels were delivered.</u>

82.    On June 6, 2020, I identified two suspicious Priority Mail parcels ("Parcels #16 and #17") that had been sent from Puerto Rico and were en route to addresses in Mattapan and Chelsea, Massachusetts. The two parcels shared several similar characteristics:  (1) each parcel was sent from Puerto Rico on June 6, 2020; (2) each parcel weighed approximately 26 pounds; (3) postage for each parcel was paid for in cash.

83.    Parcel #16 was sent from the San German, Puerto Rico Post Office on June 6, 2020. Parcel #18 weighed approximately 25 pounds, 15 ounces; it bore a handwritten label; and postage was paid for in cash.  Parcel #16 bore a return address of "Felix Montero Urb Quintas dela Reina Calle Reina Victoria M-4 San-German P.R 00683" and was addressed to "Robert Montero 24 Mattapan St Apt 2 Mattapan MA 02126" Based upon my review of USPS databases and Clear, I determined that the return address did not appear to be a valid address, and that no one named

30

"Robert Montero" appeared to be associated with the delivery address. I believe that the recipient name was a variant of Robert MONTEIRO.

84.     Parcel #17 was sent from the Boqueron, Puerto Rico Post Office on June 6, 2020. Parcel #17 weighed 26 pounds, 0 ounces; and postage was paid for in cash. Parcel #17 bore a return address of "Hector Duarte HC 2 Box 2293 Boqueron P.R 00622" and was addressed to "Juana Duarte 11 Congress Ave Apt 306 Chelsea MA 02150" Based upon my review of USPS databases and Clear, I determined that the return address did not appear to be a valid address and that no one named "Juana Duarte" appeared to be associated with the delivery address.

85.     The two parcels were scheduled for delivery on June 6, 2020.  At 12:04 p.m., data from the GPS device attached to the gray Silverado indicated the gray Silverado was stopped in front of 24 Mattapan Street, Mattapan, Massachusetts (the intended delivery site of Parcel #16), where it stayed for ten minutes. The gray Silverado then moved down the street for approximately fifteen minutes and then around the corner for six minutes.

86.     At 1:07 p.m., officers established surveillance in the area of 24 Mattapan Street, Mattapan, Massachusetts, the intended delivery address of Parcel #16. At 1:26 p.m., surveillance officers observed JOSEPH operating the gray Silverado after he drove by the address of 24 Mattapan Street.

87.     At 1:34 p.m., surveillance officers observed a USPS letter carrier arrive at the front of the delivery address for Parcel #16 (24 Mattapan Street, Mattapan, Massachusetts).  The letter carrier delivered Parcel #16 inside the front porch.

88.     At 1:40 p.m., surveillance officers observed CUE driving away from 24 Mattapan Street in a gray Audi A6 (the "gray Audi"), registered to him. At 1:43 p.m., video surveillance observed the gray Audi arrive outside 49 Woolson Street. Video surveillance showed CUE exit

the driver's seat of the gray Audi and carry a white bag around to the rear of 49 Woolson Street. CUE then returned to the street empty handed and sat on the front steps. At 2:30 p.m., GPS data and video surveillance showed the gray Silverado arrive outside 49 Woolson Street. Video surveillance showed JOSEPH open the front door of 49 Woolson Street. CUE then removed a parcel from the gray Audi consistent in size and shape as Parcel #16 and carried the parcel into 49 Woolson Street directly behind JOSEPH. I believe that CUE went to 24 Mattapan Street to retrieve Parcel #16 and waited for JOSEPH to take the parcel into 49 Woolson Street.

89.     At 3:17 p.m., surveillance officers observed a USPS letter carrier arrive at the front of 11 Congress Avenue, Chelsea, Massachusetts. Parcel #17 was delivered inside the front lobby of the building, where the mailboxes are located.

90.     At approximately 3:19 p.m., surveillance officers observed C. Fabal ("Fabal") retrieve Parcel #17 inside the lobby and walk away from the front door to the rear of the building. At 3:22 p.m., Fabal carried a parcel consistent in size and shape with Parcel #17 out of 11 Congress Avenue and placed the parcel into the trunk of a red Chevy Impala registered to Fabal (the "red Chevy Impala"). Surveillance officers followed the red Chevy Impala as it drove directly to the building of Target Location 8.

91.     Based upon my training and experience, as well as my participation in this investigation, I believe that CUE delivered Parcel #16 to 49 Woolson Street and Fabal delivered Parcel #17 to Target Location 8 to be diluted for re-distribution.

   <u>September 4, 2020: Seizure of cocaine in an air fryer contained in a suspicious parcel</u>

92.     On September 4, 2020, I sought and executed a search warrant on a cocaine parcel ("Parcel #27"), which was addressed to "David Kimble" at 9 Welch Road, Unit 9, South Easton, Massachusetts. *See* 20-mj-6564-MPK. Parcel #27 was sent from the Yauco, Puerto Rico Post

Office 00698 on September 2, 2020. Parcel #27 bore a handwritten label and postage was paid for in cash. Parcel #27 bore a return address of "Franck Kimble, Urb. Este de Yauco Calle, Tepacio AZ Yauco, P.R. 00698," and was addressed to David Kimble, 9 Welch rd Unit 9, South Easton, MA 02375." The delivery address for Parcel #27 was owned by JOSEPH's company CKP Dream Homes. Investigators observed JOSEPH performing construction at the delivery address, and USPS records listed the delivery address as vacant. On September 3, 2020, investigators observed CUE in his vehicle parked across the street from 9 Welch Road engaging in apparent counter-surveillance in anticipation of the delivery of Parcel #27. On September 4, 2020, investigators observed both CUE and JOSEPH in their vehicles parked across the street from 9 Welch Road apparently conducting counter-surveillance in anticipation of the delivery of Parcel #27. Parcel #27 contained an air fryer in its retail box. Inside the air fryer, I seized two plastic-wrapped, brick-shaped bundles of a white compressed powder, each of which field-tested positive for cocaine and weighed approximately one kilogram. The top of the kilogram wrappings bore the Puma brand logo. Based on my training and experience, I know that drug trafficking organizations often brand their drugs with markings, such as a company brand logo. This is to ensure customers know they are receiving authentic product from a particular drug trafficking organization. As will be discussed below, on April 11, 2021, during an intercepted call, CUE complained to JOSEPH about a bad batch of cocaine similar to these seized kilograms of cocaine bearing the Puma brand logo.

November 12, 2020:  JOSEPH and RINVIL coordinated the transportation of a suspicious parcel

93.     On November 12, 2020, I identified a suspicious parcel ("Parcel #32") that had been sent from Puerto Rico and was en route to an address in Mattapan, Massachusetts. Parcel #32 was sent from the Fajardo, Puerto Rico Post Office on November 10, 2020. Parcel #32 weighed approximately 20 pounds, 11 ounces; it bore a handwritten label; and postage was paid for in cash.

33

Parcel #32 bore a return address of "Jean Clark, HC 67 Box 22841, Fajardo 00738" and was addressed to "Taji Clark, 14 Harmon St Mattapan, MA 02126."

94.     Based upon my review of USPS databases and Clear, I determined that the return address was a valid address, however no one named "Jean Clark" appeared to be associated with the return address. Similarly, I determined 14 Harmon Street in Mattapan was a valid mailing address, and the name "Taji Clark" was associated with that delivery address. Taji Clark has appeared as the purported recipient on other suspicious parcels sent from Puerto Rico that were addressed for delivery to other addresses.

95.     Parcel #32 was scheduled for delivery on November 12, 2020. Prior to its delivery, investigators established surveillance in the area of the intended delivery address. At 10:35 a.m., surveillance officers observed JOSEPH driving the gray Silverado on Cummins Highway in Mattapan, Massachusetts. The gray Silverado then reversed onto Hallowell Street and parked at the corner of Hallowell Street and Cummins Highway, which is located across the street from 14 Harmon Street (the delivery address for Parcel #32). According to the GPS device attached to the gray Silverado, it remained parked at that location until 10:47 a.m.

96.     At 10:37 a.m., surveillance officers observed a USPS delivery vehicle stop directly in front of 14 Harmon Street. The USPS employee exited the delivery vehicle carrying Parcel #32 and walked up to the front door of the delivery address. The USPS employee placed Parcel #32 on the top step of the residence. The USPS employee returned to the delivery vehicle and drove away, departing the area. USPS delivery records showed that Parcel #32 was scanned delivered at 10:37 a.m. At the time of delivery, surveillance officers observed JOSEPH, who remained seated in the driver's seat of the Silverado facing the delivery address.

97.     At 10:41 a.m., surveillance officers observed Clark exit the residence at 14 Harmon Street. Clark retrieved Parcel #32 and took it back into the residence. At this time, JOSEPH remained inside the Silverado across the street.

98.     At approximately 10:44 a.m., surveillance officers observed Clark standing in the doorway of 14 Harmon Street looking in the direction of the gray Silverado and JOSEPH. At 10:46 a.m., surveillance officers observed JOSEPH drive the gray Silverado away from the area toward Mattapan Square. Surveillance officers followed the Silverado to 544 River Street in Mattapan, Massachusetts, where JOSEPH parked and remained seated.

99.     At 10:55 a.m., surveillance officers observed a white SUV park across the street from 14 Harmon Street in Mattapan. At the same time, surveillance officers observed Clark exit 14 Harmon Street carrying a large brown cardboard box, consistent in size and shape with Parcel #32. Clark carried Parcel #32 to the white SUV and placed Parcel #32 into the back of the SUV. Clark then entered the back seat on the driver's side of the SUV. The white SUV then departed the area.

100.    Surveillance officers followed both the gray Silverado and the white SUV as each vehicle traveled uninterrupted to the apartment complex at Target Location 2. At 11:12 a.m., surveillance officers observed the gray Silverado arrive outside Target Location 2. Data from the GPS device attached to the gray Silverado confirmed its arrival at Target Location 2. Surveillance officers observed JOSEPH exit the gray Silverado and walk empty-handed out of view and toward the front entrance of the building of Target Location 2.

101.    At 11:16 a.m., surveillance officers observed the white SUV arrive outside Target Location 2. I observed Clark walking away from the white SUV, carrying a large brown cardboard

box, consistent in size, shape, and color with Parcel #32. Clark entered the rear door of the building of Target Location 2 carrying the parcel. The white SUV then departed the area.

102.    Surveillance officers then observed RINVIL exit a white Mercedes and walk to the rear door of Target Location 2.  Shortly thereafter, someone opened the door, and RINVIL entered the apartment building.

103.    At 11:46 a.m., surveillance officers observed Clark and RINVIL exit the building. Clark was carrying a white box with a pink stripe in the middle.  RINVIL was carrying an opened brown cardboard box, consistent in shape and size with Parcel #32. I recognized the white box carried by Clark as being consistent in size, shape, and appearance with the air fryer boxes that have been used to hide kilograms of cocaine in seized cocaine parcels during this investigation. Clark and RINVIL placed the boxes into the rear of the white Mercedes, entered the vehicle, and departed the area at 11:47 a.m.

104.    At 11:59 a.m., JOSEPH exited the rear door of Target Location 2.  In one hand, JOSEPH was carrying a white trash bag that appeared to be full and weighted. In the other hand, JOSEPH was carrying a brown duffel bag. JOSEPH tossed the trash bag into the bed of the Silverado and put the brown duffel bag into the driver's side rear seat of the Silverado. JOSEPH then entered the Silverado and departed the area.

105.    Based upon my knowledge, training and experience, I believe that JOSEPH coordinated with Clark to transport cocaine contained in Parcel #32 to Target Location 2, where JOSEPH, RINVIL, and Clark opened Parcel #32 and removed packaging materials to be disposed at a remote location.

<u>December 22, 2020:  Seizure of approximately two kilograms of suspected cocaine</u>

106.    On December 22, 2020, I executed a search warrant on a parcel (Parcel #35) sent from Puerto Rico that I believed was related to the ongoing investigation. *See* 20-mj-6785-MPK.

107.    From inside Parcel #35, I seized approximately two kilograms of cocaine. The drugs were field-tested with presumptive positive results for the presence of cocaine. The two kilograms of suspected cocaine were hidden inside two Office Depot "Locking Latch" cash boxes (one kilogram per cash box). As discussed above, search warrants executed on other cocaine parcels identified in this investigation have similarly resulted in the seizure of approximately two kilograms of cocaine per parcel. As discussed below, investigators also began seizing cocaine contained in cash boxes and have observed NIEVES-SOSA carrying cash boxes in their retail packaging into Target Location 8.

108.    Prior to obtaining and executing the search warrant on Parcel #35, I learned from another Postal Inspector in Rhode Island that a USPS letter carrier assigned to deliver Parcel #35 on December 17, 2020 had determined that the parcel was non-deliverable because the carrier did not recognize the name of the intended recipient listed on the parcel as being associated with the delivery address (139 Cleveland Street, Providence, Rhode Island). After scanning the parcel as non-deliverable ("No Authorized Recipient Available"), the USPS letter carrier continued to make deliveries in the area. While doing so, the USPS letter carrier noticed a blue Jeep (the "blue Jeep") that appeared to be following the letter carrier. Concerned that they were being followed, the letter carrier returned to the post office with Parcel #35 and reported the incident to Postal Management, who in turned contacted the Postal Inspector in Rhode Island. I subsequently determined that the blue Jeep was registered to Enterprise Rent-A-Car and had been rented by JOSEPH on December 12, 2020.

109.    On December 17, 2020, an unidentified male went to the Olneyville Post Office in Providence, Rhode Island, inquiring about the whereabouts of Parcel #35. The unidentified male provided phone number (845) 764-3296 and asked to be contacted at that number regarding Parcel #35.

110.    On December 18, 2020, at approximately 2:58 p.m., using a USPIS undercover phone, a Postal Inspector in Rhode Island, posing as a USPS customer service employee, called telephone number (845) 764-3296. The Postal Inspector left a voicemail providing instructions that Parcel #35 was available for pick up at the Post Office located at 24 Corliss Street in Providence on December 21, 2020, between the hours of 9:00 a.m. and 11:00 a.m.

111.    On December 18, 2020, at approximately 2:58 p.m., the USPIS undercover phone received a missed call from telephone number (570) 599-9013. That telephone number is subscribed to NIEVES-SOSA at Target Location 7. Investigators have seen NIEVES-SOSA retrieve suspicious parcels addressed to Target Location 7, including on May 21, 2021.

112.    On December 18, 2020, at 3:11 p.m., the Postal Inspector in Rhode Island received a call from telephone number (646) 267-6689.  Hereinafter, I will refer to (646) 267-6689 as the "ALVARADO-DELEON Telephone 1."[10] The individual using the ALVARADO-DELEON Telephone 1 inquired about Parcel #35. The Postal Inspector informed the user of the telephone that Parcel #35 was marked un-deliverable and returned to its sender. Investigators have observed ALVARADO-DELEON and NIEVES-SOSA retrieve suspicious parcels on numerous occasions, including on May 21, 2021. I believe that ALVARDO-DELEON inquired about Parcel #35 because he wanted to obtain the two kilograms of cocaine from inside the parcel.

---

[10] Upon entering the digits of the ALVARADO-DELEON Telephone 1 into WhatsApp, a photo of ALVARADO-DELEON was displayed as the public profile picture for the ALVARADO-DELEON Telephone 1.

<u>January 23, 2021:  ALVARDO-DELEON obtained the contents of suspicious parcels and
discarded the packaging</u>

113.    On January 22, 2021, I identified two suspicious parcels that had been sent from
Puerto Rico and were en route to addresses in Lynn, Massachusetts and Salem, Massachusetts.
Parcel #36 was sent from the Moca, Puerto Rico Post Office on January 21, 2021.  Parcel #36
weighed approximately 19 pounds, 7 ounces; it bore a handwritten label; and postage was paid for
in cash. Parcel #36 bore a return address of "Heriberto Medina, P.O Box 2425 Moca, P.R 00676"
and was addressed to "Carlos Medina, 167 N Common St Apt 22, Lynn MA 01905."

114.    Based upon my review of USPS databases and Clear, I determined that the return
and delivery addresses for Parcel #36 were valid addresses. But, no one named "Heriberto Medina"
appeared to be associated with the return address. I also determined that no one named "Carlos
Medina" appeared to be associated with the delivery address.

115.    Parcel #37 was sent from the Aguadilla, Puerto Rico Post Office on January 21,
2021.  Parcel #37 weighed approximately 19 pounds, 6 ounces; it bore a handwritten label; and
postage was paid for in cash.  Parcel #37 bore a return address of "Ricardo Padilla, Po Box 3295
Aguadilla, PR 00605" and was addressed to "Luis Padilla, 49 Butler St Salem, MA 01970."

116.    Based upon my review of USPS databases and Clear, I determined that the return
and delivery addresses were valid addresses. But, no one named "Ricardo Padilla" appeared to be
associated with the return address. I also determined that no one named "Luis Padilla" appeared
to be associated with the delivery address. Parcels #36 and #37 were scheduled for delivery on
January 23, 2021. Based on their shared characteristics with other suspicious and cocaine parcels
and my experience with this investigation, I believe that Parcels #36 and #37 each contained two
kilograms of cocaine.

117.     In anticipation of their deliveries, investigators established surveillance in the areas of the delivery addresses for Parcels #36 and #37. USPS delivery records for Parcel #36 show that it was delivered to 167 N. Common Street in Lynn at 11:54 a.m. Shortly after its delivery, surveillance officers observed an unidentified Hispanic male ("UHM1") retrieve Parcel #36 and place it inside a white Acura sedan (hereinafter, the "white Acura"). Surveillance officers followed the white Acura until it arrived at Lowell Street Court in Peabody, Massachusetts at approximately 12:15 p.m.

118.     USPS business records show that Parcel #37 was delivered to 49 Butler Street, Salem, Massachusetts at 1:01 p.m. At approximately 1:10 p.m., surveillance officers observed ALVARADO-DELEON arrive at the delivery address in a blue Nissan Rogue (hereinafter, the "blue Nissan"). Investigators observed an unidentified Hispanic male exit the front passenger seat of the blue Nissan and retrieve Parcel #37 from the front of 49 Butler Street.

119.     Surveillance officers then followed the blue Nissan to Lowell Street Court in Peabody. There, ALVARADO-DELEON met with UHM1. After discarding several items from both vehicles into a dumpster, UHM1 retrieved a Christmas-themed shopping bag from the white Acura and took it over to the blue Nissan. At approximately 1:16 p.m., the blue Nissan exited Lowell Street Court, while UHM1 remained in the area. Thereafter, surveillance was terminated. I believe that UHM1 discarded packaging materials from Parcels #36 and #37 at Lowell Street Court. After UHM1 departed the area, I retrieved two empty packages consistent in size, shape, and appearance with the packaging of Parcels #36 and #37, two air fryer boxes, and two air fryers from the dumpster at Lowell Street Court. Later that same day, a narcotics-trained and certified K-9 from the Braintree Police Department alerted to the presence of narcotic odor on each of the items retrieved from that dumpster.

120.    Based upon my training and experience, as well as my participation in this investigation, I believe that UHM obtained Parcel #36 and ALVARDO-DELEON obtained Parcel #37, each of which contained cocaine. I believe that ALVARADO-DELEON discarded the packaging of Parcels #36 and #37 and kept the cocaine concealed in those parcels.

January 29, 2021: MENARD transported a suspicious parcel to the building of Target Location 4

121.    On January 29, 2021, I identified two suspicious parcels (Parcels #38 and #39) that had been sent from Puerto Rico and were en route to addresses in Quincy and Mattapan, Massachusetts. Parcel #38 was sent from Puerto Rico on January 29, 2021. Parcel #38 weighed approximately 9 pounds, 12 ounces; it bore a handwritten label; and postage was paid for in cash. Parcel #39 was sent from Puerto Rico on January 28, 2021. Parcel #39 weighed approximately 11 pounds and 9 ounces; it bore a handwritten label; and postage was paid for in cash.  The return address on the address label was, "Jose Miranda 25, Calle Ernesto Cadiz, Juncos PR 00777." Parcel #39 was addressed to "Robert MONTEIRO, 127 Hazelton St. Apt. 2, Mattapan, MA 02126."

122.    Based upon my review of USPS databases and Clear, I determined that "25 Calle Ernesto Cadiz, Juncos PR 00777" was a valid address. However, no one by the name of "Jose Miranda" was associated with that address. I determined that "127 Hazelton St. Apt. 2, Mattapan, MA 02126," was a valid address, but there did not appear to be anyone by the name of "Robert MONTEIRO" associated with that address.

123.    On January 29, 2021, at approximately 9:45 a.m., video surveillance showed ALVARADO-DELEON exit the building of Target Location 3 and enter the blue Nissan. At approximately 10:00 a.m., surveillance officers were in the area of 107 Main Street in Quincy to surveil the delivery of Parcel #38. At this time, I observed ALVARADO-DELEON drive past the delivery address approximately 5 times engaging in apparent counter-surveillance.

124.    At approximately 10:39 a.m., I observed a USPS mail carrier arrive at 107 Main Street in Quincy and place a parcel into the front foyer of the residence. USPS business records confirmed Parcel #38 was delivered at 10:40 a.m.

125.    At 10:42 a.m., I observed the blue Nissan stop in front of 107 Main Street. I observed ALVARADO-DELEON exit the blue Nissan and open the trunk. I then observed ALVARADO-DELEON retrieve Parcel #38 from the foyer of 107 Main Street and place it into the trunk of the blue Nissan. ALVARADO-DELEON then entered the driver's seat and drove away.

126.    At 10:45 a.m., surveillance was established in the area of 127 Hazelton Street, Apartment 2, in Mattapan, Massachusetts, the delivery address for Parcel #39. At 11:39 a.m., investigators observed a USPS mail carrier carry a parcel up the front stairs of 127 Hazelton Street and place it on the top step. USPS business records confirmed Parcel #39 was delivered at 11:38 a.m.

127.    At approximately 11:46 a.m., I observed RINVIL parked in front of 127 Hazelton Street. I believe that RINVIL was conducting counter-surveillance of Parcel #39. Around that time, surveillance officers observed an unidentified female exit 127 Hazelton Street, pick up Parcel #39, and take it inside 127 Hazelton Street.

128.    At 12:17 p.m., investigators observed MENARD arrive in the area of 127 Hazelton Street in a blue Honda Accord registered to MENARD (hereinafter, the "blue Honda Accord"). At 12:19 p.m., investigators observed MENARD exit the blue Honda Accord and enter 127 Hazelton Street. Seconds after MENARD arrived at 127 Hazelton Street, surveillance officers observed RINVIL leave the area. I believe that RINVIL was conducting counter-surveillance of 127 Hazelton Street and Parcel #39 until MENARD came to retrieve the parcel. At 12:21 p.m.,

42

surveillance officers observed MENARD exit 127 Hazelton Street, enter the blue Honda Accord, and reverse the vehicle closer to 127 Hazelton Street.

129.    At 12:22 p.m., investigators observed the same female who retrieved Parcel #39 exit 127 Hazelton Street carrying a parcel consistent in size, shape, and color with Parcel #39. Surveillance officers observed her hand the parcel to MENARD. MENARD then placed the parcel into the rear driver's side seat of the blue Honda Accord and left the area.

130.    Investigators followed MENARD from 127 Hazelton Street in Mattapan to the parking lot of Target Location 4. At 1:02 p.m., investigators observed CUE's BMW X5 arrive and park next to MENARD's vehicle. At 1:04 p.m., video surveillance showed CUE and MENARD exit their respective vehicles. CUE went to the blue Honda Accord and retrieved a parcel consistent in size, shape, and color with Parcel #39 and carried it into the building of Target Location 4.

131.    At 1:10 p.m., video surveillance showed CUE exit the building and enter the BMW X5. CUE and MENARD then left the area in their respective vehicles.

132.    I believe that (a) Parcels #38 and #39 contained two kilograms of cocaine each, and (b) that CUE and MENARD arranged the transportation of Parcel #39 to their stash location at Target Location 4.

<u>ALVARADO-DELEON suspected of delivering drug proceeds to New York on March 21, 2021 and March 25, 2021</u>

133.    On March 21, 2021, at 8:51 a.m., video surveillance showed ALVARDO-DELEON exit the building of Target Location 3 with an unidentified Hispanic male. ALVARADO-DELEON was carrying a large black duffel bag. The black duffel bag appeared to be full. ALVARADO-DELEON loaded the black duffel bag into the trunk of a gray Nissan Altima, rented by JOSEPH (the "gray Nissan Altima"). At 2:44 p.m., the gray Nissan Altima was recorded on a license plate reader in New York City. A review of pen register data showed that at 5:30 p.m.,

43

Target Telephone 1, used by JOSEPH, contacted the ALVARDO-DELEON Telephone 1 via WhatsApp. Based on my training, experience, and knowledge of this investigation, I believe that ALVARADO-DELEON transported the black duffle bag, containing drug proceeds, to New York City for the purpose of either paying for previously-delivered shipments of cocaine and/or securing additional shipments of cocaine.

134.    On March 25, 2021, at 9:30 a.m., video surveillance outside Target Location 3, showed ALVARDO-DELEON exit the building of Target Location 3. ALVARADO-DELEON was carrying a large red suitcase, a large black gym-style bag, and a medium-sized blue and white bag. Both the suitcase and the two bags appeared to be full. ALVARADO-DELEON loaded the suitcase into the trunk of the gray Nissan Altima. A second male also exited the building of Target Location 3 carrying a large black suitcase and a small black satchel.  The second male loaded the suitcase into the trunk of the gray Nissan Altima. Observing the manner in which the second male loaded the suitcase, it appeared as though it was full and very heavy. The second male returned inside the building and retrieved another blue backpack and placed it into the gray Nissan Altima. Investigators surveilled ALVARADO-DELEON driving the gray Nissan Altima from 100 Liberty Place to Interstate 93 Southbound to the Rhode Island border before terminating physical surveillance. At 2:11 p.m., the gray Nissan Altima was recorded on a license plate reader in New York City. A review of pen register data showed that the day prior, on March 24, 2021, from 6:52 p.m. through 8:25 p.m., Target Telephone 1, used by JOSEPH and the ALVARADO-DELEON Telephone 1, exchanged 12 contacts via WhatsApp. Based on my training, experience, and knowledge of this investigation, I believe JOSEPH and ALVARADO-DELEON discussed his planned transportation of drug proceeds to New York the following day. On March 25, 2021, from 9:26 a.m. through 9:32 a.m., JOSEPH's telephone and the ALVARADO-DELEON Telephone 1

exchanged seven contacts via WhatsApp. Based upon my training, experience, and knowledge of this investigation, and short period of time between ALVARADO-DELEON's trips to New York City, I believe JOSEPH and ALVARADO-DELEON were confirming ALVARADO-DELEON's transportation of drug proceeds to New York. Based on the prior seizure of bulk cash from BAEZ-MUNOZ on May 21, 2020 and his lack of involvement in this drug trafficking conspiracy after that date, I believe that ALVARADO-DELEON has now assumed the role of transporting bulk cash to New York to be laundered.

<u>The criminal use of Target Locations 7 and 8</u>

135.    Investigators have surveilled multiple packages transported to 1 Webster Avenue in Chelsea, the building of Target Location 8, from June 2020 to May 2021. Investigators learned from the building management that BERRIO resides in Target Location 8. The building management advised that BERRIO pays the rent for Target Location 8. A video camera installed in the hallway outside Target Location 8 (with the consent of building management) has regularly depicted BERRIO coming and going from Target Location 8, particularly around the time of suspicious parcels coming into Target Location 8, as described in part below. Further, video surveillance has shown NIEVES-SOSA going to Target Location 8 carrying air fryer boxes and locking cash boxes and leaving with bags or backpacks. I believe that NIEVES-SOSA is delivering cocaine to BERRIO and retrieving drug proceeds and/or diluted kilograms of cocaine for the JOSEPH DTO at Target Location 8.

<u>March 5, 2021: NIEVES-SOSA and ALVARADO-DELEON transported a suspicious parcel into Target Location 8</u>

136.    On March 5, 2021, investigators surveilled the delivery of a suspicious parcel delivered to NIEVES-SOSA's residence, Target Location 7. Prior to the delivery, investigators

observed NIEVES-SOSA exit Target Location 7, scan the street, and re-enter the residence. Following the delivery of the suspicious parcel, investigators observed a black Mercedes sedan (the "black Mercedes") drive slowly down the street and circle the block. I am familiar with the black Mercedes because I have observed it transporting other suspicious parcels in the past. This day, I believe the driver of the black Mercedes was conducting counter-surveillance in an effort to identify law enforcement.

137.    The driver, an unidentified Hispanic male, parked, exited the black Mercedes, and walked down the street while scanning parked vehicles in the area. I believe that the driver of the black Mercedes was continuing his counter-surveillance effort on foot. The driver then re-entered the black Mercedes and drove away.

138.    Subsequently, investigators observed NIEVES-SOSA exit the residence, retrieve the suspicious parcel, and take it into the residence. A short-time later, investigators observed NIEVES-SOSA exit Target Location 7 carrying an apparently full backpack and an empty cardboard box into the driveway and out of view. NIEVES-SOSA then drove away from the area. Investigators maintained surveillance of NIEVES-SOSA. Investigators drove past the driveway of Target Location 7 and observed an apparently empty brown cardboard box, consistent in size, color, and appearance with the suspicious parcel delivered to Target Location 7. Investigators followed NIEVES-SOSA to the building of Target Location 8. Surveillance officers were unable to maintain surveillance of NIEVES-SOSA's vehicle as it went into a narrow parking area.

139.    After NIEVES-SOSA arrived outside Target Location 8, video surveillance showed BERRIO open the door to Target Location 8 for ALVARADO-DELEON, who carried two air fryer boxes into Target Location 8. Investigators believe that ALVARADO-DELEON was in the vehicle with NIEVES-SOSA as they travelled together to the building of Target Location 8. Less

than one hour later, video surveillance showed BERRIO exit Target Location 8, each carrying an air fryer box. They carried the air fryer boxes to BERRIO's vehicle, which is registered to BERRIO.

140.    Based upon my training and experience, as well as my participation in this investigation, I believe that ALVARADO-DELEON retrieved a suspicious parcel, which was not surveilled by investigators. On March 3, 2021, the same date that the suspicious parcel was mailed from Puerto Rico to Target Location 7, five suspicious parcels were mailed from Puerto Rico to Massachusetts connected to this case by IP tracking history. I further believe that NIEVES-SOSA also retrieved a suspicious parcel from his residence. I believe that ALVARDO-DELEON and NIEVES-SOSA transported the cocaine concealed inside those suspicious parcels to Target Location 8, where BERRIO diluted the cocaine and before moving it out of Target Location 8 for re-distribution.

April 12-13, 2012: NIEVES-SOSA delivered the contents of suspicious parcels to Target

Location 8

141.    On April 12, 2021, investigators performed controlled deliveries of two suspicious parcels. The first was delivered to 25 Ridge Avenue, Apartment 2, in Lynn, Massachusetts. NIEVES-SOSA retrieved the first suspicious parcel from the delivery address and transported it into Target Location 8. Investigators could not identify who opened the door for NIEVES-SOSA. NIEVES-SOSA was carrying what appeared to be a locking cash box still in its retail packaging. After a moment inside Target Location 8, NIEVES-SOSA left Target Location 8 with a large brown paper bag. The second suspicious parcel was delivered to NIEVES-SOSA's residence, Target Location 7. After the delivery of the second suspicious parcel to Target Location 7, NIEVES-SOSA retrieved the parcel and took the second suspicious parcel into Target Location 8.

Investigators could not identify who opened the door for NIEVES-SOSA. NIEVES-SOSA was carrying what appeared to be a locking cash box still in its retail packaging. This time, NIEVES-SOSA left empty-handed.

142.    On April 13, 2021, investigators conducted a controlled delivery of a third suspicious parcel at 53 Elm Street, Apartment 2, in Lynn, Massachusetts. After the delivery, NIEVES-SOSA retrieved the suspicious parcel from the delivery address and transported it into Target Location 8. BERRIO opened the door for NIEVES-SOSA to take the suspicious parcel, which was still intact, into the apartment. After 10 minutes in the apartment, NIEVES-SOSA left with the same suspicious parcel, this time with the top flap open.

143.    I believe that on April 13, 2021, NIEVES-SOSA obtained some or all of the cocaine that was transported to Target Location 8 on April 12, 2021, which was diluted for re-distribution. I further believe that NIEVES-SOSA transported the third suspicious parcel to Target Location 8 for the cocaine to be diluted for re-distribution.

May 14, 2021: ALVARDO-DELEON and NIEVES-SOSA transport a suspicious parcel into
Target Location 8

144.    On May 14, 2021, investigators surveilled ALVARADO-DELEON and NIEVES-SOSA retrieve a suspicious parcel sent from Puerto Rico to Providence, Rhode Island and transport it directly into Target Location 8. ALVARADO-DELEON was driving a rented Dodge Charger, rented by JOSEPH (the "Dodge Charger"). On that date, NIEVES-SOSA took the suspicious parcel into Target Location 8 and left empty-handed.

145.    On May 17, 2021, investigators surveilled ALVARADO-DELEON and NIEVES-SOSA retrieve a suspicious parcel sent from Puerto Rico to Providence, Rhode Island and transport it directly into Target Location 8 in the Dodge Charger. On this date, NIEVES-SOSA took the

suspicious parcel into Target Location 8 and left with two large brown paper bags. ALVARADO-DELEON and NIEVES-SOSA then drove and parked outside ALVARDO-DELEON's residence, Target Location 3. ALVARADO-DELEON took one of the large brown paper bags into the building of Target Location 3. NIEVES-SOSA then travelled to Lawrence, Massachusetts, made one stop, and then travelled back to the building of Target Location 3 in Randolph, a two-hour round-trip drive. Investigators observed NIEVES-SOSA carry a large brown cardboard box from the Dodge Charger into the building of Target Location 3.

146.    I believe that on May 17, 2021, NIEVES-SOSA obtained some or all of the cocaine that was transported to Target Location 8 on May 14, 2021, which was diluted for re-distribution. I believe that ALVARADO-DELEON and NIEVES-SOSA then took the diluted cocaine to Target Location 3. I further believe that NIEVES-SOSA took some of the diluted cocaine to Lawrence for re-distribution.

147.    The following day, on May 18, 2021, video surveillance outside Target Location 8 showed BERRIO carry a case of baby formula into the apartment. Investigators have never seen BERRIO with an infant or any infants or pregnant woman coming and going from Target Location 8. Further, the management office of Target Location 8 informed investigators that BERRIO does not have children. Based on my training and experience, I know that baby formula is a common cutting agent for cocaine. A few hours after BERRIO brought the baby formula into Target Location 8, investigators observed ALVARADO-DELEON and two other individuals drive from Target Location 3 to the building of Target Location 8. ALVARADO-DELEON was a passenger in the vehicle. After arriving, investigators observed the driver enter Target Location 8 without any suspicious parcel. The driver left Target Location 8 with a bag containing an object that appeared to be the size of a shoe box. ALVARADO-DELEON and the two other individuals then

returned to Target Location 3 and transported the bag from Target Location 8 into the building of Target Location 3.

148.    I believe that BERRIO diluted the cocaine transported to Target Location 8 on May 17, 2021 and that ALVARADO-DELEON went to Target Location 8 to retrieve some or all of the diluted cocaine and took it back to Target Location 3.

149.    Earlier that day, video surveillance showed JOSEPH arrive in his vehicle outside the building of Target Location 3. ALVARADO-DELEON exited the building of Target Location 3 and placed a brown cardboard box (consistent in size, shape, and appearance to the box brought into the building of Target Location 3 by NIEVES-SOSA the day prior) into JOSEPH's pickup truck. JOSEPH then drove to the building of Target Location 4. JOSPEH parked outside the building and carried the box into the building. I believe that JOSEPH went to Target Location 3 to obtain cocaine from ALVARDO-DELEON and transport it to his stash location at Target Location 4.

150.    I believe that Target Location 8 is a drug processing location operated by BERRIO. I believe that ALVARADO-DELEON and NIEVES-SOSA transported parcels containing cocaine to Target Location 8. I believe that after receipt of the cocaine, BERRIO diluted the cocaine with cutting agents, including baby formula. I further believe that after the cocaine was diluted, ALVARADO-DELEON and NIEVES-SOSA retrieved the diluted cocaine and stored the cocaine in Target Location 3. After the cocaine arrived at Target Location 3, I believe JOSEPH retrieved the cocaine and brought it into the stash location at Target Location 4.

## Part III. Intercepted communications and surveillance

March 22, 2021: CUE directed HACKETT to Target Location 4 for a drug deal

151.     On March 22, 2021, at 1:14 p.m., K. HACKETT ("HACKETT"), who was using (617) 581-2561 (the "HACKETT Telephone"),[11] sent a text message to CUE, who was using Target Telephone 3. HACKETT asked, "Do you have Zelle?" CUE replied, "Yeah." I believe that HACKETT asked CUE if he has Zelle, a peer-to-peer payment system, to accept payment for drugs. Around the time of this text exchange, investigators had established video and physical surveillance outside of target Location 4.

152.     At 1:28 p.m. investigators observed CUE, driving his BMW X5, pull into and park outside Target Location 4. Investigators also observed JOSEPH arrive in a rented white Nissan Sentra (the "white Nissan Sentra"). Both JOSEPH and CUE exited their respective vehicles and entered the building of Target Location 4. At 1:31 p.m., CUE called HACKETT. CUE asked, "How long you going to be?" HACKETT replied, "I'm on my way now. So, it should take me like 20 minutes." CUE asked, "Alright, and you said just a half, though?" HACKETT replied, "Yeah."

153.     At 1:49 p.m., HACKETT sent a text message to CUE and stated, "7mins." At 1:55 p.m., CUE sent a text message to HACKETT and stated, "I'm coming out." I believe that HACKETT informed CUE that he was close to 100 Liberty Place and CUE responded that he would meet him outside Target Location 4. Around that time, investigators observed a white Jeep, registered to HACKETT, park outside Target Location 4. Investigators observed CUE exit the building of Target Location 4 carrying a white trash bag and another object in his left hand. CUE walked toward a dumpster, out of view, carrying the two items. Investigators observed HACKETT

---

[11] Based on the timing of intercepted communications and surveillance, I believe that HACKETT is the user of the HACKETT Telephone

exit his vehicle and walk toward CUE empty handed and then out of view, behind the dumpster. After a brief moment, CUE and HACKETT (who had both hands in his sweatshirt front pocket) walked from behind the dumpster toward HACKETT's parked Jeep and stood near the Jeep appearing to engage in conversation. Investigators also observed JOSEPH walk from the direction of the building of Target Location 4 and wave to HACKETT. JOSEPH then continued to walk out of view.

154.    At 2:00 p.m., CUE received a text message from Zelle confirming that HACKETT paid him $800. At the same time, investigators observed CUE look at his phone. CUE then appeared to show his phone to HACKETT, who was standing next to him.

155.    I believe that HACKETT paid CUE for a half-ounce of cocaine via Zelle. Further, based on my training and experience, $800 is consistent with the price of a half-ounce of cocaine.

<u>April 14, 2021: CUE used Target Telephone 3 to facilitate a drug deal with HACKETT</u>

156.    On April 14, 2021, at 1:41 p.m., HACKETT, who was using the HACKETT Telephone, sent a text message to CUE, who was using Target Telephone 3. HACKETT wrote, "Omw." CUE replied, "Ok waiting on u." At 1:50 p.m., video surveillance showed CUE depart his residence at Target Location 5 in his BMW X5 and drive to the building of Target Location 4. CUE appeared to wait in his vehicle after parking.

157.    At 2:10 p.m., HACKETT called CUE and advised, "GPS is putting me… 10 minutes out." At 2:18 p.m., CUE received a text message from Zelle confirming that HACKETT paid him $1,000. At 2:29 p.m., video surveillance showed HACKETT park outside the building of Target Location 4 and enter the building with CUE. After one minute, video surveillance showed CUE and HACKETT exit the building and return to their respective vehicles. Both CUE

and HACKETT then departed the area. I believe that CUE sold $1,000 worth of cocaine (slightly over half an ounce) to HACKETT at Target Location 4.

158.    Following the suspected drug deal, investigators followed HACKETT to the building of Target Location 11, where he entered the building.

<u>May 13, 2021: HACKETT boasted about selling cocaine to White people</u>

159.    On May 13, 2021, at 2:33 p.m., CUE, who was using Target Telephone 3, called HACKETT, who was using the HACKETT Telephone. HACKETT stated, "I've been out with my White friends… I had a fun time… Them n****s just want to drink and do blow." CUE agreed. HACKETT continued, "All I want to do is drink and take their money." I believe that HACKETT was bragging to CUE about having a good time with his White friends who are only interested in drinking and using cocaine ("I've been out with my White friends… I had a fun time… Them n****s just want to drink and do blow."). I further believe that HACKETT drinks and sells cocaine to his White friends ("All I want to do is drink and take their money.").

<u>March 22, 2021:  RINVIL and CUE discussed RINVIL's desire to rob a drug dealer</u>

160.    On March 22, 2021, at 4:33 p.m., RINVIL, who was using Target Telephone 2, called CUE, who was using Target Telephone 3. RINVIL stated, "It's nice. I don't know. Yo, this the sh** about Boston. There be no… it's mad nothing, it's just…" CUE asked, "What you say? There's nothing to do out here?" RINVIL replied, "Hell no!" CUE responded, "That's why we got to get you right. So, you can just focus on getting money. You won't be bored then." RINVIL stated, "Right now, all this time on my hands. I'm just watching, waiting for my moves. Some n**** going to slip up." CUE replied, "Boy, stop thinking like that." RINVIL replied, "Alright, if you were in my shoes, you would think the same, too. You'll see. If you was in my shoes, you would think the same, too." CUE stated, "I keep telling your brother he needs to just let you run,

run forward." RINVIL replied, "The funny sh** with my sh** though. I've been told him to hoop a n****. I told this n**** about the sh**, like some homie goes 'Ah, ah.' But, this n**** don't give a f***… I'm just waiting for a n****. I'm telling you, you get caught slipping, I'm going to catch them. N****s is low key out. That's one thing I'll give them." CUE replied, "You crazy as hell." Thereafter, CUE hung up to take another call.

161.    I believe that RINVIL and CUE were discussing the following: RINVIL complained to CUE that there was nothing to do in Boston on a nice day ("Yo, this the sh** about Boston. There be no… it's mad nothing."). Based on RINVIL's criminal history, I know that RINVIL was most recently incarcerated in New York and was now living in the Boston area. CUE told RINVIL that he was advocating for JOSEPH to give him more responsibility in the JOSEPH DTO so RINVIL would not be bored ("So, you can just focus on getting money. You won't be bored then… I keep telling your brother he needs to just let you run, run forward."). RINVIL stated that he told JOSEPH they should rob a drug dealer, but that JOSEPH was not interested ("I'm just watching, waiting for my moves. Some n**** gonna slip up… I've been told him to hoop a n****. I told this n**** about the sh**, like some homie goes 'Ah, ah.' But, this n**** don't give a f***."). I further believe that RINVIL told CUE he was waiting for the right victim ("I'm just waiting for a n****. I'm telling you, you get caught slipping, I'm going to catch them."), but that Boston based drug dealers are not so easily identified ("N****s is low key out here. That's one thing I'll give them."). Based on this conversation, I believe that RINVIL has weapons, perhaps a firearm, that would be used to rob a drug dealer. As discussed above, I believe that RINVIL now resides at Target Location 4 and for the reasons discussed below am requesting a no-knock warrant for Target Location 4.

March 23, 2021: CUE directed a customer to Target Location 4 for a drug deal

162.   On March 23, 2021, at 10:52 a.m., A. Merrill ("Merrill"), who was using (857) 249-0853 (the "Merrill Telephone"),[12] called CUE, who was using Target Telephone 3. Merrill stated, "I'm here." CUE replied, "I'm pulling in right now." Merrill replied that he had his child with him, which irritated CUE. CUE replied, "Okay, whatever. We'll be on the low."

163.   At the time of the call, video surveillance showed a vehicle registered to Merrill arrive outside the building of Target Location 4. Video surveillance also showed CUE arrive outside the building of Target Location 4 driving the BMW X5. CUE, Merrill, and a child entered the building of Target Location 4. After a brief time, CUE exited the building carrying an apparently full bag to the BMW X5. Merrill and the child also exited the building, and Merrill went to the trunk area of his vehicle. Both men then departed the area.

164.   I believe that CUE and Merrill arranged to meet at Target Location 4 to complete a drug deal for an unknown quantity and type of drug. Based on the arrest discussed below, I believe that Merrill purchased cocaine from CUE. I believe that Merrill informed CUE that he was bringing his son to the drug deal. However, I believe that CUE stated they could be discreet with the drug deal in the child's presence ("Okay, whatever. We'll be on the low.").

May 1, 2021: Merrill arrested after meeting CUE for a drug deal

165.   On May 1, 2021, at 2:26 p.m., CUE called Merrill, who was using the Merrill Telephone. CUE asked Merrill how long he would be, and Merrill replied, "Right now I'm in Topsfield… 55-50 minutes." At 3:19 p.m., CUE called Merrill to again inquire how far he was.

---

[12] Based on the timing of intercepted calls, surveillance, and Merrill's arrest described below, I believe that Merrill is the user of the Merrill Telephone.

Merrill stated, "I'm at the next exit out." At the time, the GPS tracking device attached to CUE's BMW X5 showed that it was outside Target Location 4.

166.    At 3:22 p.m., video surveillance showed a blue GMC Terrain arrive outside the building of Target Location 4. At the same time, Merrill called CUE and stated, "I'm here." Based on a later stop, investigators learned that Merrill was operating the blue GMC Terrain. Investigators were unable to observe Merrill enter the building of Target Location 4. However, at 3:55 p.m., video surveillance showed Merrill exit the building of Target Location 4 and enter the blue GMC Terrain and leave the area. Believing that CUE sold drugs to Merrill inside Target Location 4, investigators followed Merrill.

167.    At 4:45 p.m., at the direction of investigators, a State Police Trooper stopped Merrill's vehicle in the area of 10 Willard Street in Quincy due to the vehicle's revoked registration. Merrill was the operator and sole occupant of the vehicle. The Trooper determined that the blue GMC Terrain would be towed due to the revoked registration and asked Merrill to exit his car. During an inventory search, the Trooper seized a switchblade and several Suboxone strips in the driver's side door. Merrill stated he had a prescription for the Suboxone, but he did not have it with him. In the trunk of the vehicle, the Trooper picked up an open box of cookies. Inside the box of cookies, the Trooper seized a bag containing several sandwich bags containing a white, rock-like substance. Based on the Trooper's training and experience, he recognized the substance to be either cocaine or fentanyl. Based on the investigation and my own observations of the substance, I believe that it is cocaine base. Merrill was placed into custody and charged in state court with drug offenses. The suspected cocaine base weighed approximately 62 grams. It was later secured and will be transported to the State Police Drug Laboratory for confirmatory analysis.

<u>March 24, 2021: CUE and JOSEPH discussed MENARD living at Target Location 2</u>

168.    On March 24, 2021, at 8:39 p.m., CUE, who was using Target Telephone 3, called JOSEPH, who was using Target Telephone 1. CUE told JOSEPH, "Night just hit me because he has been seeing roaches."[13] JOSEPH replied, "I have been there for four years, and I have never seen roaches. This n**** has been there for two months, and he's dragging roaches in. He probably travelled with them, cause roaches hide in backpacks and sh**, depending on where you are."

169.    I believe that CUE informed JOSEPH that MENARD complained to him about seeing cockroaches at JOSEPH's condominium, Target Location 2 ("Night just hit me because he has been seeing roaches."). Based on surveillance of MENARD, I believe that he is living at Target Location 2. I believe that JOSEPH stated that he has owned Target Location 2 for four years and had never seen cockroaches there, but that after living there for two months, MENARD brought cockroaches into Target Location 2 ("I have been there for four years and I have never seen roaches. This n**** has been there for two months.").

<u>March 26, 2021: CUE directed HOPKINS's girlfriend to Target Location 4 for a drug deal</u>

170.    On March 26, 2021, at 9:39 a.m., an unidentified female, who was using (401) 678-0214 (hereinafter, "UF-0214"), called CUE, who was using Target Telephone 3. UF-0214 stated, "Hey, this is [HOPKINS's] girlfriend."  CUE replied, "Jesus Christ, I was hoping you didn't call right now. I'll be right there."  UF-0214 replied, "Ok, no. I'm just telling you, I'm like 15 minutes away, it says."  CUE replied, "Okay, alright. I'll be right there." At 9:41 a.m., investigators

---

[13] No call was intercepted over Target Telephone 3 between CUE and MENARD immediately prior to this call. Intercepted communications have established that CUE also uses encrypted communications applications. Based on the minimal volume of intercepted calls between CUE and MENARD, I believe that CUE mainly communicates with MENARD using encrypted applications.

observed CUE exit his residence at Target Location 5, enter the BMW X5, and depart the area. At
9:46 a.m., video surveillance showed CUE arrive outside the building of Target Location 4 driving
the BMW X5. CUE exited his vehicle, scanned the area, then entered the building of Target
Location 4 using a key. At 9:50 a.m., video surveillance showed a small red hatchback park outside
the building of Target Location 4. Video surveillance showed a Black female (believed to be UF-
0214) exit the red hatchback vehicle and enter the building.

171.    At 9:53 a.m., CUE received an incoming call from UF-0214. UF-0214 stated, "Hey,
I'm here." CUE replied, "Ok. You know which building?" UF-0214 replied. "I believe it's the
[unintelligible]."  CUE replied, "You still got the red car?" UF-0214 replied, "Yep, the little red
car. I just pulled up." CUE then said, "Ok, Yup. I'm…" UF-0214 asked, "Do you want me to go
to that door?" CUE replied, "Yeah, you can just go upstairs 'cause I'm getting it together for him
right now. If you could just give me a second." UF-0214 stated, "Alright, I'll come up." CUE
asked, "You by the door?" UF-0214 replied, "Yup." CUE stated, "Just come up all the way to the
third." UF-0214 replied, "Okay."

172.    A few minutes later, at 10:07 a.m., video surveillance showed UF-0214 exit the
building of Target Location 4, walk to the red hatchback vehicle, enter the vehicle, and depart the
area. At 10:10 a.m., video surveillance showed CUE exit the building of Target Location 4. CUE
entered his vehicle and departed the area. I believe that CUE and UF-0214 arranged to meet at
Target Location 4 to complete a drug deal on behalf of HOPKINS (UF-0214: "Hey, this is
[HOPKINS'] girlfriend… I'm like 15 minutes away"). I believe that CUE needed more time to
prepare drugs for HOPKINS because he was not expecting her so early ("Yeah, you can just go
upstairs 'cause I'm getting it together for him right now."). I believe that CUE drove to Target
Location 4 to finish preparing drugs for HOPKINS and to meet UF-0214 for the drug deal. I believe

this occurred at Target Location 4 because Target Location 4 is the only unit on the third floor of the building of Target Location 4 ("Just come up all the way to the third.").

**March 27, 2021: CUE obtained drugs from Target Location 4 then went to Target Location 10 to deliver drugs to ARCHIE**

173.    On March 27, 2021, at 1:30 p.m., ARCHIE, who was using (857) 247-2728 ("the ARCHIE Telephone"),[14] called CUE, who was using Target Telephone 3. ARCHIE stated, "What's going on? You coming out?" CUE replied that he was downtown with his son. ARCHIE stated, "Alright, well…if you're around, I'm kind of low. I got dough." CUE replied that he wanted to drop off his son before meeting ARCHIE. ARCHIE agreed.

174.    At 5:09 p.m., CUE called ARCHIE. CUE asked, "You on the S?" ARCHIE replied, "Yeah." CUE stated, "Alright.  I'm about to go to the spot and then come right to you." ARCHIE'S driver's license lists his residence as Target Location 10. I believe CUE asked if ARCHIE was home because ARCHIE lives on Spencer Street in Dorchester ("You on the S?").

175.    At 5:28 p.m., video surveillance showed CUE arrive in his BMW X5 outside the building of Target Location 4. CUE exited his vehicle and used a key to enter the building. At 5:35 p.m., CUE exited the building, entered his vehicle, and departed the area. Investigators surveilled CUE drive to Target Location 10.

176.    At 6:02 p.m., CUE called ARCHIE stating, "Hey, I'm on Milton Ave. I'll be there in one second." At 6:07 p.m., surveillance officers observed CUE's vehicle arrive in the area of Target Location 10. CUE exited his vehicle with a child, believed to be his son. At 6:10 p.m.,

---

[14] The ARCHIE Telephone is subscribed to ARCHIE at Target Location 10. Further, based on the timing of calls and surveillance of meetings between CUE and ARCHIE, I believe that ARCHIE is the user of the ARCHIE Telephone.

investigators observed CUE on the porch of Target Location 10 speaking with ARCHIE. At 6:14 p.m., investigators observed CUE and his son enter his vehicle and depart the area.

177.    I believe that ARCHIE called CUE to order drugs from CUE because his supply was low and he had money to purchase more drugs ("If you're around, I'm kind of low. I got dough."). I believe that CUE stated he would go to his stash location at Target Location 4 and then meet ARCHIE at Target Location 10 to complete the deal ("You on the S?... I'm about to go to the spot and then come right to you.").

### March 31, 2021: ARCHIE received a complaint about cocaine supplied by CUE

178.    On March 31, 2021, at 7:45 p.m., ARCHIE, who was using the ARCHIE Telephone, called CUE, who was using Target Telephone 3. ARCHIE stated, "I got a dude just standing in front of me, right? And he comes to see me like almost every day. As soon as I see you yesterday,[15] he's complaining about… The flavor and it was wet." CUE replied, "It's the same thing off the same slab." ARCHIE replied, "That's all I need to hear." I believe that ARCHIE received a complaint from a customer about cocaine ARCHIE supplied ("He's complaining about… The flavor and it was wet."). I believe that CUE informed ARCHIE that the drugs he provided the day prior were from the same kilogram of cocaine that CUE previously provided to ARCHIE ("It's the same thing off the same slab."). As further discussed below, around this time period, CUE started receiving complaints about the quality of the cocaine he supplies.

---

[15] The day prior, investigators had surveilled CUE meeting with unidentified individuals outside Target Location 10.

<u>April 9, 2021: ARCHIE informed CUE that he was waiting for a customer's payment before he</u>

<u>could pay CUE</u>

179.    On April 9, 2021, at 2:53 p.m., CUE, who was using Target Telephone 3, called ARCHIE, who was using the ARCHIE Telephone. CUE stated, "I'm outside." ARCHIE stated, "I knew you were. Listen to me so I don't have to walk all the way back downstairs… I got a dude that's coming to see me at 5:00. He's coming from Worcester. You come anytime after that. I'll have everything ready." CUE replied, "Alright, I'll come around 8:00 then." CUE stated, "After this one, I'm bringing the ticket down too. Did anybody else say anything?" ARCHIE stated, "I had a couple… He came to see me from when I double it… I've been dealing with him for a minute, so I was like, 'Alright.' But then I had a regular dude that comes for smalls. He said something, but I said, 'I take the bitter with the sweet. Like… I don't make it.'"

180.    I believe the following about the call between CUE and ARCHIE: CUE went to ARCHIE's residence to retrieve payment for drugs. At that time, CUE was not driving the BMW X5 because it was being repaired, so investigators were unable to surveil or confirm CUE's location. ARCHIE was waiting for a customer from Worcester to come at 5:00 before he could pay CUE. CUE informed ARCHIE that he would lower the price of cocaine for ARCHIE next time because of past complaints ("After this one, I'm bringing the ticket down too. Did anybody else say anything?"). ARCHIE had two customers complain, one that was a new customer and one that was a regular customer. ARCHIE informed the regular customer that sometimes the cocaine is good and sometimes it is bad ("I've been dealing with him for a minute, so I was like, 'Alright.' But then I had a regular dude that comes for smalls. He said something, but I said, 'I take the bitter with the sweet.'"). Investigators did not observe any meetings between CUE and ARCHIE that day.

<u>March 31, 2021 and April 7, 2021: CUE directed a customer to MENARD</u>

181.　　On March 31, 2021, at 6:49 p.m., K. Sault ("Sault"), who was using (339) 236-9708 (the "Sault Telephone"),[16] sent a text message to CUE, who was using Target Telephone 3. Sault asked, "Work right?" CUE called Sault and confirmed he was at work. Sault asked, "So you are not home till later? How come you don't have somebody that I can go to?... It ain't much. You know what I mean?" CUE replied, "Yeah, but it is not enough to have somebody to sit around for." Sault stated, "Oh. Okay." CUE stated, "If it was something bigger…" Sault interrupted, "I figure there was someone you know that be getting them in the zone and sh**." CUE stated, "I can start... I can start having my... You can see my boy Night if I'm not around." CUE continued, "I could put you onto my boy Night… You want to see if him right now?" Sault stated, "Yeah… I don't think he like dealing really with me too much because I don't buy enough, I think." CUE stated, "Alright." Sault replied, "Hit that dude up to see."

182.　　I believe that Sault contacted CUE to arrange a small drug deal. I believe that Sault asked why CUE didn't have a drug courier or distributor who was available ("How come you don't have somebody that I can go to?... It ain't much."). I believe that CUE directed Sault to contact MENARD for the deal ("You can see my boy Night, if I'm not around."). I believe that Sault has bought drugs from MENARD and thinks that MENARD does not like him because he is a small-volume customer ("I don't think he like dealing really with me too much because I don't buy enough.").

183.　　At 6:53 p.m., Sault called CUE. CUE stated, "You can see him if you want." Sault replied, "Alright, I'm not going to… You know… You're going to be my guy, when you around.

---

[16] Based on the timing of calls and surveillance of meetings between CUE and Sault, I believe that Sault is the user of the Sault Telephone.

You know what I mean? But, usually, when it's nighttime I don't be seeing you anyways. Since, it's just too late." CUE replied, "I don't care, you know it's staying in the same circle." CUE continued, "Find me some big plays. That's what I need."

184.    I believe that Sault preferred to give his drug business to CUE ("You're going to be my guy."). I believe that CUE assured Sault that he and MENARD are in the same organization so that Sault's money would be staying in the same organization ("I don't care, you know it's staying in the same circle."). I believe that CUE solicited Sault to setup large-volume drug deals ("Find me some big plays.").

185.    After the call, CUE sent a text message to Sault that stated, "Night Properties Cell +1 (857) 318-9807." Hereinafter, (857) 318-9807 will be referred to as the MENARD Telephone.[17] A pen register for the MENARD Telephone showed that Sault attempted to call and text MENARD, but no calls connected. Around the time of this call, investigators had established surveillance in the area of Target Location 2. Following the attempted calls from Sault, an investigator observed MENARD leave the area of Target Location 2 in Randolph operating a blue Honda Accord, registered to him. Investigators maintained surveillance of MENARD but did not observe him meet with Sault.  Investigators instead observed MENARD conduct a brief transaction with a Black male at a Burger King parking lot in Mattapan, Massachusetts. Based on surveillance officers' training and experience and the brief exchange in the parking lot, officers suspected that MENARD conducted a narcotics transaction with the Black male. Thereafter, MENARD returned directly to the building of Target Location 2 in Randolph. On May 14, 2021, investigators witnessed MENARD conduct a similar transaction with the same Black male in Mattapan, consistent with a hand-to-hand drug sale.

---

[17] Further, the MENARD Telephone is subscribed to MENARD.

<u>April 7, 2021: CUE explained to Sault that CUE and MENARD worked together</u>

186.     On April 7, 2021, at 4:09 p.m., Sault called CUE. Sault asked, "What's up with Night?" CUE replied, "I'll tell him to call you now." Sault asked, "Can you have him call me please?" CUE replied, "Your number come up blocked." Sault stated, "Oh. That's why nobody is answering." I believe that Sault called CUE to inform him that MENARD never answered his phone calls on March 31, 2021. I believe that CUE informed Sault that his phone number came up blocked and may be the reason why MENARD did not answer on March 31, 2021.

187.     Following the call with Sault, at 4:10 p.m., CUE, who was using Target Telephone 3, called MENARD, who was using (857) 318-9807. CUE asked, "You home?" MENARD stated, "No. I'm on my way there though." CUE stated, "Call Sault. S-A-U-L-T… I think I sent you his stuff already." MENARD acknowledged the request. I believe that CUE directed MENARD to call Sault to arrange a drug deal. Between 7:12 p.m. and 7:17 p.m., Sault and MENARD exchanged two text messages and two telephone calls. I believe that MENARD and Sault communicated to arrange a drug deal. At 9:00 p.m., investigators observed MENARD enter his blue Honda Accord parked outside Target Location 2. Investigators surveilled him travel to the Blue Hills Reservation in an attempt to surveil the meeting between MENARD and Sault. On Blue Hill River Road, MENARD made an abrupt U-turn in the middle of the roadway. Investigators recognized this as a possible counter-surveillance technique and terminated surveillance of MENARD at that point to preserve the secrecy of the investigation.

<u>April 9, 2021: CUE met Sault for a drug deal because MENARD did not have powder cocaine</u>

188.     On April 9, 2021, at 2:20 p.m., CUE called Sault, who was using the Sault Telephone. CUE stated, "I can call you when I'm back up that way or you could call Night." Sault stated, "He didn't have what I wanted." CUE replied, "He didn't have it? He got it now." Sault

asked, "He does? It's the same?" CUE replied, "You want… Undone?" Sault stated, "Yeah. When do I come for flick?" CUE answered, "The last couple of times it's been for that." Sault replied, "Has it? Oh yeah. Well, it depends if it's from P. Yeah."

189.    I believe the following about the above-mentioned intercepted call: CUE called Sault to arrange a drug deal or to direct him to see MENARD. Sault informed CUE that MENARD did not have powder cocaine, only cocaine base ("He didn't have what I wanted."). A pen register confirmed that MENARD and Sault exchanged a telephone call that day before CUE called Sault. CUE asked if Sault wanted powder cocaine rather than cocaine base ("You want… Undone?"). Sault stated that he rarely wants cocaine base, unless he is getting it from JOSEPH ("When do I come for flick… Well, it depends if it's from P. Yeah.").

190.    At 4:27 p.m., CUE called Sault. Sault informed CUE that he was five minutes away. At 4:31 p.m., investigators observed CUE arrive to the building of Target Location 4. At 4:39 p.m., investigators observed a Range Rover, rented by Sault, arrive outside the building of Target Location 4. Investigators observed Sault exit the vehicle and enter the building. At 4:42 p.m., Sault exited the building, returned to his vehicle, and departed the area. I believe that Sault met CUE at Target Location 4 to buy powder cocaine from him because MENARD did not have any.

<u>April 10, 2021: CUE informed JOSEPH about a bad batch of cocaine</u>

191.    On April 10, 2021, at 7:53 p.m., CUE, who was using Target Telephone 3, called JOSEPH, who was using Target Telephone 1. CUE stated, "I don't know what the hell is going on." JOSEPH asked, "About what?" CUE stated, "With everything." JOSEPH asked, "What happened?" CUE replied, "Uh… like everyone cracked. It's just like terrible." JOSEPH stated, "So, just don't do nothing unless it's right." Based on the investigation and the calls described above, I believe that CUE tried unsuccessfully to cook the cocaine into cocaine base and informed

JOSEPH that they had a bad batch of cocaine ("I don't know what the hell is going on… It's just like terrible."). I believe that JOSEPH informed CUE not to sell any cocaine unless the quality was good ("So, just don't do nothing unless it's right.").

April 11-12, 2021: CUE and JOSEPH make plans about what to do with the bad batch of cocaine

192.     On April 11, 2021, at 8:30 a.m., CUE, who was using Target Telephone 3, called JOSEPH, who was using Target Telephone 1. During a spot check of the conversation, investigators intercepted a conversation between JOSEPH and CUE discussing what to do about the bad batch of cocaine. CUE stated, "You spoke to him? He said Wednesday, right?" JOSEPH responded, "Yeah."

193.     I believe that JOSEPH was referring to ALVARADO-DELEON's return to Massachusetts from the Dominican Republic. Based on Homeland Security records, I know that ALVARADO-DELEON travelled to the Dominican Republic on March 26, 2021 and listed JOSEPH as his emergency contact on his flight information. Based on WhatsApp pen registers, I know that JOSEPH was in communication with ALVARADO-DELEON via WhatsApp while he was in the Dominican Republic. At the time of the call, ALVARADO-DELEON was scheduled to return to Massachusetts on Wednesday, April 14, 2021, also based on Homeland Security records. On Thursday, April 15, 2021, I observed through video surveillance outside the building of Target Location 3 that ALVARADO-DELEON had returned to Massachusetts, corroborating that JOSEPH was referring to ALVARADO-DELEON with CUE.

194.     CUE continued, "All that sh** is straight *basura* (Spanish meaning, trash) again." JOSEPH stated, "Word." CUE stated, "It's like a few months ago." JOSEPH replied, "Leave it alone then. I'll just take them back. I just got to wait. He doesn't come back until Wednesday. So, probably not until next week." CUE asked, "You told him though?" JOSEPH replied, "Nah. I

know he comes back on Wednesday. You just have to…" CUE interrupted, "Well, I had some done up. Do you think Tanesha could take that or Scandal?" JOSEPH asked, "Who?" CUE asked, "You could give it to Scandal?" JOSEPH replied, "Scandal takes years." CUE asked, "He's not moving fast no more?" JOSEPH stated, "No. Hell no. He only got like two people. He got Frog and this other kid."

195.    I believe that CUE and JOSEPH discussed the following: CUE asked JOSEPH if he had communicated to ALVARADO-DELEON about returning the bad batch of cocaine ("All that sh** is straight *basura* again… You told him though?"). JOSEPH instructed CUE to not sell the bad batch of cocaine, that he will take back the bad cocaine from CUE, and talk to ALVARADO-DELEON about the bad batch after he returns to Massachusetts ("Leave it alone then. I'll just take them back. I just got to wait. He doesn't come back until Wednesday. So, probably not until next week."). CUE informed JOSEPH that he had already cooked into cocaine base, so that it could not be returned ("Well, I had some done up."). CUE asked JOSEPH if he knew anyone who could sell the bad cocaine ("Well, I had some done up. Do you think Tanesha could take that or Scandal?") JOSEPH thought that Scandal would take too long to sell the cocaine ("Scandal takes years.").

196.    On April 12, 2021, at 7:52 a.m., CUE called JOSEPH. During a spot check of the conversation, investigators intercepted a conversation between JOSEPH and CUE about the bad batch of cocaine. CUE stated, "I swear to God. I'm getting... Yo! This is just like a few months back when them Pumas was around. Everybody's calling like pissed off now. My phone is like dead now. My sh** went from rocking to stopping." JOSEPH replied, "Yeah. Well, leave all that sh** alone and just wait. That's all a n**** can do. I mean, I don't know what happened. Like, I don't know what to…" CUE interrupted, "Like even the fast one. It smelled like gasoline, n****.

So, I was just like, 'Oh, it might be poppin. '" JOSEPH stated, "Yeah, well f*** it. Don't force the issue or you can be like, 'Yo, this is what it is. It's either you're going to f*** with it, or not.' The only bad thing is this n**** don't get here until Wednesday and I don't see nothing happening until next week." CUE replied, "But yeah... F***ing um... They're all buggin', they buggin'."

197.    I believe that in this intercepted communication that CUE and JOSEPH discussed the following: CUE and JOSEPH had received a bad batch of cocaine several months ago that was labeled with the Puma brand logo ("This is just like a few months back when them Pumas was around.").[18] CUE complained to JOSEPH that all of his customers were upset about the bad batch of cocaine and that he went from a busy time selling cocaine to no business at all ("Everybody's calling like pissed off now. My phone is like dead now. My sh** went from rocking to stopping."). JOSEPH informed CUE to stop selling the bad batch of cocaine or inform people that the bad quality cocaine is all he has and that customers can take it or leave it ("Leave all that sh** alone and just wait. This is what it is. It's either you're going to f*** with it, or not."). JOSEPH would not do anything about returning the bad batch of cocaine until ALVARADO-DELEON returned to Massachusetts ("This n**** don't get here until Wednesday and I don't see nothing happening until next week,"). CUE did not understand what happened because the bad batch of cocaine smelled right, like gasoline, and he sold it quickly ("Like even the fast one. It smelled like gasoline."). Based on my training and experience, gasoline or kerosene is often used to produce cocaine from coca leaves and that cocaine can often smell like gasoline. Based on the investigation and the calls discussed above, I believe that JOSEPH intended to accept the bad batch of cocaine,

---

[18] As discussed above, on September 4, 2020, I sought and obtained a search warrant for a parcel that contained approximately two kilograms of cocaine. The top of the kilogram wrappings bore the Puma brand logo.

likely kilograms, back from CUE sometime after ALVARDO-DELEON returned to Massachusetts.

<u>April 10, 2021: JOSEPH arranged a drug deal with MONTEIRO at Target Location 4</u>

198.    On April 10, 2021, at 12:40 p.m., JOSEPH, who was using Target Telephone 1, called MONTEIRO, who was using (305) 801-7744 (the "MONTEIRO Telephone").[19]  JOSEPH stated, "You could head over there right now." MONTEIRO replied, "Alright. I just hopped out of the shower, so I'm about to..."  JOSEPH told MONTEIRO to hurry because he had to take his son to a football game. MONTEIRO agreed.

199.    At 1:08 p.m., investigators observed, via video surveillance, JOSEPH arrive outside the building of Target Location 4. Investigators observed JOSEPH enter the building. At 1:22 p.m., investigators observed, via video surveillance, JOSEPH and MONTEIRO exit the building. MONTEIRO was carrying what appeared to be a white bag. MONTEIRO entered a gray Infiniti G35, registered to MONTEIRO at Target Location 9. Investigators identified MONTEIRO using his driver's license image. Investigators observed JOSEPH and MONTEIRO drive away from Liberty Place in their respective vehicles. Based on the intercepted call, brief meeting, and my knowledge of the investigation, I believe that JOSEPH completed a drug deal inside Target Location 4 with MONTEIRO.

200.    Investigators surveilled MONTEIRO to the area of 51 Memorial Parkway in Randolph, Massachusetts. There, investigators observed MONTEIRO meet with an individual in a black Infiniti vehicle, which pulled up next to MONTEIRO's vehicle. MONTEIRO was observed

---

[19] MONTEIRO is the subscriber of the MONTEIRO Telephone with an address of MONTEIRO's residence, Target Location 9. Further, based on the timing of intercepted communications and surveillance, I believe that MONTEIRO is the user of the MONTEIRO Telephone.

manipulating an item in the left rear door of his vehicle. Investigators then observed MONTEIRO walk up to the passenger window of the black Infiniti and lean inside the vehicle. Investigators then observed MONTEIRO walk away from the black Infiniti carrying a weighted bag back to his vehicle. I believe that MONTEIRO exchanged the drugs received from JOSEPH at Target Location 4 in exchange for cash from the occupant of the black Infiniti, which was contained in the weighted bag.

201.    Investigators then surveilled MONTEIRO back to his residence at Target Location 9. Investigators observed MONTEIRO enter the side door of Target Location 9 carrying a weighted white plastic bag. I am familiar with Target Location 9, because there have been suspicious parcels shipped from Puerto Rico to this address during the course of this investigation from May 2020 to November 2020. Several parcels were also addressed to MONTEIRO or some variation of his name during this investigation. During this investigation, I have also observed MONTEIRO receive suspicious parcels shipped from Puerto Rico after they were delivered to addresses in Massachusetts.

<u>April 15, 2021 Seizure of a cocaine parcel contained in a locking cash box</u>

202.    On April 13, 2021 during a review of USPS business records, I identified a suspicious parcel shipped on April 10, 2021 from Puerto Rico, a known source location for cocaine, to Quincy, Massachusetts ("Parcel #41"). Parcel #41 was addressed to Richard Alcantara at 98 Lancaster Street in Quincy, Massachusetts. On April 14, 2021, I caused Parcel #41 to be removed from the mail stream. After the parcel was removed from the mail stream and marked un-deliverable, NIEVES-SOSA, using (570) 599-9013, called the Quincy Post Office. The caller-ID for this phone number displayed "Oscar Sosa," and was photographed. NIEVES-SOSA identified himself to a USPS employee as Richard Alcantara and inquired about the whereabouts

of Parcel #41, expressing urgency to obtain the parcel. The USPS employee informed NIEVES-SOSA that the parcel was marked un-deliverable and returned to the sender. On April 15, 2021, I sought and obtained a federal search warrant and opened Parcel #41. *See* 21-6272-MPK. From inside Parcel #41, investigators seized approximately two kilograms of cocaine inside a locking cash box. Other investigators who were present and I noted the distinct smell of gasoline emitting from the cocaine. This is consistent with CUE's statement on April 11, 2021 that his recent supply of cocaine smelled of gasoline.

April 15, 2021: Controlled delivery of a suspicious parcel to Target Location 3 following cocaine seizure

203.    On April 13, 2021, I identified a suspicious parcel shipped on April 10, 2021 from Puerto Rico to Target Location 3 (hereinafter, "Parcel #42").

204.    Following the search and seizure of Parcel #41, investigators conducted a controlled delivery of Parcel #42 to the management office for Target Location 3 on April 15, 2021.  Parcel #42 was scanned delivered by the Inspector at 4:35 p.m. The Inspector who made the delivery identified Andrea M. ("Andrea M.") as a woman in the management office. I am familiar with Andrea M. because she has sent text messages to JOSEPH, intercepted over Target Telephone 1, identifying herself as the property manager. Based on intercepted communications discussed further below, I believe that JOSEPH trusts Andrea M., but she only knows JOSEPH as "Taji."

205.    Shortly after the delivery, at 4:50 p.m., the WhatsApp pen register for Target Telephone 1 showed contact between ALVARADO-DELEON and JOSEPH, who was using Target Telephone 1. After this WhatsApp contact, at 4:53 p.m. Target Telephone 1 sent a text message to Andrea M. JOSEPH stated, "Good afternoon I'm going to send my friend to pick up

some sneakers." Andrea M. replied, "Got it." I believe that JOSEPH informed Andrea M. that ALVARADO-DELEON or NIEVES-SOSA would come retrieve Parcel #42 on his behalf ("I'm going to send my friend to pick up some sneakers."). I further believe that Andrea M. knew that JOSEPH receives mail and/or parcels at Target Location 3 and acknowledged that he authorized someone to retrieve Parcel #42 on his behalf ("Got it.").

206.    Shortly after this text message exchange, investigators observed NIEVES-SOSA and ALVARADO-DELOEN exit the building of Target Location 3. Both NIEVES-SOSA and ALVARADO-DELEON scanned the parking area, in an apparent effort to conduct counter-surveillance. NIEVES-SOSA then walked to and entered the management office for the apartment complex. ALVARADO-DELEON returned inside the building of Target Location 3. NIEVES-SOSA then exited the management office carrying a parcel consistent in size, shape, and color to Parcel #42 and returned into the building of Target Location 3. I believe that NIEVES-SOSA, accompanied by ALVARADO-DELEON, retrieved Parcel #42 and returned to Target Location 3 at JOSEPH's direction. I further believe that Parcel #42 contained two kilograms of cocaine.

April 16, 2021: CUE and JOSEPH discussed RINVIL living at their stash location, Target Location 4

207.    On April 16, 2021, at 1:31 p.m., CUE, who was using Target Telephone 3, called JOSEPH, who was using Target Telephone 1. CUE stated, "He's got to apologize to [McBrayer], I don't think that's a good idea. Number one, he's over there, and Zack can pop up anytime. God forbid he pop up, n**** out there f***ing he like…" JOSEPH continued, "It don't make sense to be having Tom, Dick, and Larry at base." CUE replied, "I mean, I get what you're saying, but it's like the same repetitive people." JOSEPH stated, "It doesn't matter. Have them go see Night… Start going by Night or just have Night take care of everybody. That's the way to go. It's just too

72

much… It's just too much over there. God forbid a slime ball f***ed up." I believe that CUE was concerned that RINVIL was living at the stash location at Target Location 4 because RINVIL's probation officer could make unannounced home visits and see their drug stash ("He's over there, and Zack can pop up anytime. God forbid he pop up."). I further believe that JOSEPH asked CUE to send their drug customers to MENARD at Target Location 2 instead ("Have them go see Night… Start going by Night or just have Night take care of everybody.").

208.    Near the end of the call, JOSEPH stated, "You know what's kind of f***ed up? Andrea think my name is Taji. So I'm going to need you to add me." CUE replied, "I'm tired of cutting corners, okay? We have to at some point in time do something right." I believe that JOSEPH informed CUE that Andrea M. thought his name was Taji, so he could not add himself to the lease at Target Location 4 (the Comcast utilities at Target Location 3 are in the name of Taji Clark, and JOSEPH has directed Andrea M. to allow others to receive packages for him at Target Location 3). I believe that CUE was interested in moving their stash location to avoid "cutting corners" and allowing RINVIL to live at their stash location with JOSEPH as the lease holder.

April 16, 2021: JOSEPH and CUE continued to discuss the bad batch of cocaine

209.    On April 16, 2021, at 6:34 p.m., CUE, who was using Target Telephone 3, called JOSEPH, who was using Target Telephone 1. CUE stated, "Eat a f***ing d***." JOSEPH asked, "Why you say that?" CUE replied, "You can't take the rest of that bullsh** and give to somebody?" JOSEPH stated, "Like, who am I going give it to with everything else I got?" CUE stated, "Don't get an attitude with me." JOSEPH stated, "I'll call you back, man." CUE and JOSEPH then engaged in a brief social conversation. JOSEPH then ended the call stating, "Alright, man. I got to do these numbers, man."

210.    I believe that CUE was upset that JOSEPH had not accepted the bad batch of cocaine ("You can't take the rest of that bullsh** and give to somebody?"). I believe that JOSEPH stated that he had a significant supply of cocaine and could not find someone to take the bad batch of cocaine from CUE ("Like, who am I going give it to with everything else I got?"). I believe that JOSEPH needed to assess his supply and finances before committing to taking the bad batch from CUE ("I'll call you back man… I got to do these numbers.").

April 17, 2021: JOSEPH and MONTEIRO discussed JOSEPH's new shipment of cocaine

211.    On April 17, 2021, at 7:46 a.m., investigators observed, via video surveillance, that JOSEPH arrived in the white Nissan Sentra outside the building of Target Location 3. Investigators observed JOSEPH enter the building of Target Location 3 empty-handed. A few minutes later, JOSEPH exited the building of Target Location 3 carrying a large, weighted white plastic shopping bag. JOSEPH placed the shopping bag into the driver's side rear passenger seat. JOSEPH then drove to the building of Target Location 4. Through video surveillance, investigators observed the white Nissan Sentra pull into the parking lot outside of the building and park. Investigators then observed JOSEPH walk across the parking lot toward the building carrying what appeared to be the same white shopping bag in his left hand and enter the building of Target Location 4. I believe that JOSEPH retrieved the contents of Parcel #42 from Target Location 3 and took cocaine and/or drug proceeds into his drug stash location at Target Location 4.

212.    On April 17, 2021, at 1:49 p.m., MONTEIRO, who was using the MONTEIRO Telephone, called JOSEPH, who was using Target Telephone 1. JOSEPH stated, "I got something that you can have them try." MONTEIRO asked, "Oh. Yeah?" JOSEPH stated, "Yeah. So let me know 'cause I'm... I'm here now if you want me wait for you here. I just grabbed it this morning." MONTEIRO asked, "How many did you get?" JOSEPH replied, "Three." MONTEIRO and

JOSEPH then arranged a time to meet. JOSEPH then stated, "So, when you come just re... return the pair that don't fit." MONTEIRO agreed. JOSEPH stated, "We go from there. We just see if these ones fit."

213.    I believe that MONTEIRO called JOSEPH to arrange a drug deal. I believe that JOSEPH informed MONTEIRO that he had a new supply of drugs that he received that morning and was at Target Location 4 ("I got something that you can have them try… I just grabbed it this morning."). I believe that JOSEPH informed MONTEIRO that he had three kilograms of cocaine available ("Three."). I believe that JOSEPH was willing to accept a return of the bad batch of cocaine (possibly two kilograms) from MONTEIRO when he provided the new supply ("Return the pair that don't fit.").

214.    At 2:18 p.m., investigators observed MONTEIRO's Infiniti G35 parked outside his residence, Target Location 9. At 2:55 p.m., surveillance officers observed MONTEIRO exit the building of Target Location 9, enter his vehicle, and depart the area. At 3:07 p.m., the GPS device attached to the white Nissan Sentra showed that it was at Good Samaritan Medical Center in Brockton. Investigators learned that JOSEPH's son broke his arm and JOSEPH took him to the hospital. At 3:27 p.m., surveillance officers observed MONTEIRO return to the building of Target Location 9. I believe that JOSEPH cancelled the meeting with MONTEIRO because of his son's injury. As discussed below, MONTEIRO directed JOSEPH to retrieve the bad batch of cocaine from Target Location 9 at a later date.

<u>May 10, 2021: JOSEPH retrieved drugs from MONTEIRO</u>

215.    On May 10, 2021, at 7:53 p.m., JOSEPH, who was using Target Telephone 1, called MONTEIRO, using the MONTEIRO Telephone. JOSEPH asked, "You home?" MONTEIRO stated, "No, I'm in the gym. But… Your product be on my kitchen table." MONTEIRO explained

that someone was at his house. JOSEPH stated, "I'm going to go grab 'em." At 8:44 p.m., MONTEIRO called JOSEPH. MONTEIRO stated, "I guess when we talk and I'll bring you… I'll bring you the bills tomorrow or something." JOSEPH stated, "We'll link up tomorrow." MONTEIRO stated, "I got you tomorrow. You got all the products and sh** though, right?" JOSEPH stated, "Yeah. I got that."

216.   At 8:22 p.m., investigators observed JOSEPH arrive outside MONTEIRO's residence, Target Location 9. JOSEPH had a conversation at the side of the residence with an unidentified female. JOSEPH then returned to his vehicle and departed the area back to Target Location 1. The GPS device attached to JOSEPH's vehicle showed that it returned to Target Location 1, where it stayed overnight. I believe that JOSEPH went to MONTEIRO's residence to retrieve the bad batch of cocaine as discussed on April 17 and returned to Target Location 1 ("You got all the products and sh**. Yeah.").

April 18, 2021: CUE sold drugs to Mack at Target Location 4. Mack later arrested in possession of cocaine base.

217.   On April 18, 2021, at 12:07 p.m., R. Mack ("Mack"), who was using (857) 353-1919 (the "Mack Telephone"),[20] called CUE, who was using Target Telephone 3. Mack asked, "You at the crib?" CUE stated, "I'm around… I'm at home. But I could…" Mack interrupted, "I'm leaving Brockton right now… So where do you want me to go?" CUE replied, "At the same spot. I'll just meet you over there… Just call me when you're like 10 minutes away." Based on the following intercepted communications and surveillance, I believe that Mack arranged a drug deal with CUE at Target Location 4 ("the same spot").

---

[20] Based on Mack's later arrest and call to CUE describing the arrest, I believe that Mack is the user of the Mack Telephone.

218.    In anticipation of this drug deal, investigators established surveillance in the area of Target Location 4. Soon after this call, investigators observed Mack arrive in a gray Acura TL outside the building of Target Location 4. Investigators observed CUE arrive in his BMW X5. Investigators observed Mack and CUE enter the building of Target Location 4. After a short time, Mack and CUE exited the building of Target Location 4 and departed the area in their respective vehicles. Investigators maintained surveillance of Mack as he travelled to Dorchester. Mack made no other stops.

219.    At 1:21 p.m., in Dorchester, officers conducted a vehicle stop of Mack because of a defective taillight. Mack also had a revoked driver's license. Officers arrested Mack for operating a vehicle with a revoked driver's license. During the booking process, an officer conducted a pat-frisk and felt an object concealed inside Mack's pants. Mack removed the item from his pants, which was a plastic bag containing two smaller bags. One of the smaller bags contained a white powdery substance. The other contained a white rock-like substance. A field-test of both substances revealed that the powder substance tested positive for cocaine and the white rock-like substance tested positive for cocaine base. Both bags were weighed and totaled four grams. The drugs were secured and will be delivered to a drug laboratory for further analysis. Mack was charged and posted bail.

220.    At 6:01 p.m., Mack called CUE. Mack asked, "You still around?" CUE asked, "Yeah. What's the matter?" Mack replied, "I got jammed up." CUE asked, "Where are you right now?" Mack replied, "They booking me... I just bailed out. They booking me at C-11... Them n****s found that sh** in my a**, my n****. Made me take it out bro. And I only paid $540." I believe that Mack informed CUE that he was arrested in Dorchester after being stopped ("I got jammed up."). I further believe that Mack informed CUE that officers seized the cocaine and

77

cocaine base he had just purchased from CUE from his between his buttocks ("Them n****s found that sh** in my a**, my n****. Made me take it out bro."). I believe that Mack informed CUE that he was released after posting $500 bail and a $40 fee ("And I only paid $540.").

221.    At 8:51 p.m., Mack again called CUE to try to arrange another drug deal. Mack stated, "Can I come get with you or what?" CUE replied, "Can you wait until the morning, bro? Like… If you can wait until morning. It's kind of dead tonight. You should relax, too." Mack stated, "Alright." I believe that Mack wanted to meet with CUE to obtain more drugs ("Can I come get with you or what?"). I believe that CUE declined to meet him and convinced Mack to wait until the morning, particularly given his arrest that day ("Can you wait until the morning, bro? Like… If you can wait until morning. It's kind of dead tonight. You should relax, too.").

<u>April 19, 2021, JOSEPH and CUE discussed purchasing narcotics</u>

222.    On April 19, 2021, at 3:04 p.m., JOSEPH, who was using Target Telephone 1, made a call to CUE, who was using Target Telephone 3. JOSEPH asked CUE, "What are you doing?  Did you have this n**** call me?" CUE replied, "I told him to call you."  JOSEPH said, "So what do you want to do?" CUE replied, "I don't know, it's up to you." JOSEPH said, "It's not worth grabbing all of them at that number." CUE said, "I know. See… See if Junior wants something." JOSEPH replied, "But Junior…but we can't make nothing on him."  CUE stated, "Then tell him that. Tell him it's too steep, that you thought about it, and it's too steep." JOSEPH replied, "I mean, I'll grab one." CUE stated, "It's you… It's your call. I'm at work, living my civilian life." JOSEPH asked, "So, what you want to do?  You want to just grab one a piece?" CUE stated, "I mean, truthfully, I don't think we need it."  JOSEPH replied, "We really don't.  I mean…" CUE stated, "I mean, yo, at that price, I can wait."  JOSEPH replied, "Yeah, yeah, that works, too.

So just tell him we'll wait it out man. It's too high."  CUE agreed, "Uh-huh." JOSEPH told CUE, "If he don't want to come down, then we'll wait."  CUE agreed, "Ok."

223.    I believe JOSEPH and CUE discussed purchasing one kilogram each of cocaine from a source ("You want to just grab one a piece?"). However, JOSEPH and CUE thought the price was too high, they had a supply of cocaine, and were willing to wait until the price came down ("So just tell him we'll wait it out man. It's too high."). I believe that CUE suggested reselling a kilogram of cocaine to ALVARADO-DELEON ("See if Junior wants something.") I believe that JOSEPH was not interested in reselling a kilogram of cocaine to ALVARADO-DELEON because he could not make a profit by reselling a kilogram of cocaine to ALVARADO-DELEON ("But Junior…but we can't make nothing on him.").

### April 20, 2021 and May 11, 2021: HOPKINS arranged a drug deal with CUE

224.    On April 20, 2021, at 10:37 a.m., HOPKINS, who was using (617) 318-7157 (the "HOPKINS Telephone"),[21] called CUE, who was using Target Telephone 3.[22] HOPKINS stated, "Homie wants to come see you. Alright, cool?" CUE asked, "What was he going to do?" HOPKINS replied, "A half." CUE replied, "Okay." HOPKINS asked, "How long?" CUE replied, "I'm about to head there right now." HOPKINS stated, "He's in Brockton, so tell him to leave in like 2 minutes." CUE replied, "15 minutes to be on the safe side."

---

[21] HOPKINS provided the HOPKINS Telephone to his federal probation officer as his telephone number.

[22] Prior to this call, pen register data showed that HOPKINS called A. Willis ("Willis"), who was using the Willis Telephone, described below.

225.    At 11:21 a.m., HOPKINS called CUE.[23] CUE stated, "Damn, I was just calling you. I'm pulling in right now." HOPKINS stated, "He's outside for you." Based on the investigation and further intercepted communications discussed below, I believe that HOPKINS arranged to have an individual pick up half a kilogram of cocaine from CUE ("What was he going to do?... A half.").

226.    At the same time that HOPKINS called to say "he" was outside, investigators observed CUE arrive outside the building of Target Location 4. Investigators observed CUE and an individual later identified as Willis enter the building of Target Location 4. Approximately 30 minutes later, investigators observed Willis exit the building of Target Location 4 and enter a gray Nissan Altima, rented in Willis' name.[24] A few minutes later, CUE exited the building of Target Location 4 and entered the BMW X5 and departed the area. Surveillance officers followed Willis as he made several short trips to various addresses and businesses in Brockton for approximately one hour before terminating surveillance. I believe that CUE supplied Willis with half a kilogram of cocaine at Target Location 4.

227.    On May 11, 2021, at 10:12 a.m., HOPKINS called CUE, who was using Target Telephone 3. HOPKINS  stated," Can you go to your spot? He's about to come see you. About to drop it off to you." CUE asked, "Just the change?" HOPKINS stated, "Yeah." CUE replied, "Alright, I'll head there now." I believe that HOPKINS informed CUE that Willis was heading to

---

[23] According to pen register data, seconds before this call between HOPKINS and CUE, Willis called HOPKINS.

[24] On the rental application, Willis listed his address as 16 Prospect Street, Brockton, Massachusetts and his telephone number as (617) 751-9699 (hereinafter, the "Willis Telephone").

Target Location 4 ("Can you go to your spot?"). I further believe that HOPKINS informed CUE that Willis had money to pay CUE for drugs previously received ("Just the change?... Yeah.").

228.    At 10:28 a.m., investigators observed CUE arrive and park in the parking lot outside the building of Target Location 4. At 10:41 a.m., investigators observed Willis arrive in a Chevy Blazer, rented by Willis. Investigators observed Willis approach the passenger window of CUE's vehicle. After one minute, CUE and Willis departed the area of Target Location 4 in their respective vehicles. Surveillance officers followed Willis to the building of Target Location 12. Willis was carrying a bag over his shoulder as he went into the second-floor apartment, which is the apartment below Target Location 12.

229.    As Willis was en-route to Fall River, at 10:52 a.m., HOPKINS called CUE. HOPKINS asked, "You're straight, right?" CUE replied, "Yeah. Did he give me 18?" HOPKINS stated, "Alright." CUE replied, "Alright. Good looks." HOPKINS stated, "I got to see my P.O. (meaning, probation officer) tomorrow. Then I got to… appointments for me to go up there. You feel me?" CUE replied, "Oh, okay." HOPKINS stated, "So I'll be back, too. I been letting him do his thing, [unintelligible] back to it like…" CUE stated, "Yeah, he was telling me about the situation. I might need in on that." HOPKINS stated, "Yeah. Just let me know. No bullsh**. While I've been gone, I put the n**** like real right, on everything." CUE stated, That's what he was just saying. But, I don't believe. He said he could put 10?" HOPKINS replied, "What?" CUE stated, "He said he put 10 on one?" HOPKINS stated, "You could. He probably did. I don't know. I let him do his own thing. So you know, he probably stretched it. You could, but I only put five on it." CUE stated, "Okay. I do like three." HOPKINS stated, "Nah. That's probably…" The call then abruptly disconnected.

230.    I believe that CUE asked HOPKINS if Willis had paid him $18,000 ("Did he give me 18?... Alright."). Based on my training and experience, $18,000 is the approximate street value of half a kilogram of cocaine. I believe that Willis obtained half a kilogram of cocaine from CUE on April 20, 2021, as discussed above, and was paying for those drugs on May 11, 2021. I further believe that HOPKINS informed CUE that he put Willis in charge of his drug business while HOPKINS is on federal supervised release ("While I've been gone, I put the n**** like real right, on everything."). I believe that CUE and HOPKINS discussed HOPKINS's fentanyl distribution operation and that CUE was interested in joining a fentanyl distribution operation ("Yeah, he was telling me about the situation. I might need in on that."). I believe Willis informed CUE that he diluted one gram of fentanyl with 10 grams of cutting agents ("He said he put 10 on one?"). I believe that HOPKINS advised CUE that he let Willis run his own fentanyl operation, but that HOPKINS diluted his fentanyl at a five to one ratio ("I let him do his own thing. So you know, he probably stretched it. You could, but I only put five on it."). I further believe that CUE advised he only diluted his fentanyl at a three to one ratio ("I do like three.").

### April 29, 2021: HOPKINS arranged a drug transaction with CUE

231.    On April 29, 2021, at 1:22 p.m., CUE, who was using Target Telephone 3, called HOPKINS, who was using the HOPKINS Telephone. CUE stated, "You're heading to Randolph or heading there?" HOPKINS replied, "No. She's heading to there." Based on prior intercepted communication and surveillance, I believe that HOPKINS was sending his girlfriend to meet CUE for a drug deal. I believe that CUE was asking if HOPKINS was meeting him at Target Location 4 or at his workplace in Woburn.

232.    At 3:48 p.m., HOPKINS called CUE. CUE stated, "Can you tell her to meet me at that Chipotle because there is people at the parking lot." I believe that CUE instructed HOPKINS

to inform his girlfriend to meet CUE at the Chipotle near his workplace in Woburn because there were people in the parking lot at his workplace.

233.    At 3:54 p.m., surveillance officers observed CUE enter the Chipotle at 112 Commerce Way in Woburn. At 3:57 p.m., CUE asked, "Is it a blue Malibu?" HOPKINS stated, "She said dark… that she just went into the bathroom. Tall, skinny girl, she said." CUE replied, "Okay. I see her. She just came out." At that time, surveillance officers observed CUE meet with an unidentified female standing by a rented blue Chevy Malibu vehicle with a New Jersey registration (the "Chevy Malibu"). Based on prior surveillance, investigators believe that the unidentified female was HOPKINS's girlfriend. Around the same time, a tall, skinny female walked out of the Chipotle and went to the driver's side of CUE's vehicle and appeared to remove something from the vehicle before returning to the driver's seat of the Chevy Malibu. Upon a review of the driver's license photograph of the renter, investigators identified the driver as C. Colon ("Colon") of Salem, Massachusetts.

234.    Officers followed the Chevy Malibu to an apartment building in Lewiston, Maine, an over two-hour drive from Woburn. Officers observed the Chevy Malibu parked and running, with the driver's seat unoccupied, in the parking lot of the building. The passenger seat appeared to be fully reclined, and officers were unable to identify if anyone was in the passenger seat. Approximately 20 minutes later, Colon returned to the Chevy Malibu and left the area. Officers followed the Chevy Malibu to Lynn, Massachusetts, where the passenger appeared to get out of the vehicle and enter another vehicle. Officers then followed the Chevy Malibu to the Marriot Residence Inn in Danvers. Officers terminated surveillance after observing the Chevy Malibu parked and unoccupied in the back lot of the hotel. Based on HOPKINS's criminal history, which includes a federal drug distribution conviction, and the brief trip to an apartment building in

Lewiston, Maine, two hours away from Woburn, I believe that HOPKINS had arranged a drug deal between Colon, his girlfriend, and CUE, and that Colon and HOPKINS's girlfriend re-distributed the drugs received from CUE in Lewiston, Maine.

<u>April 30, 2021: MENARD and CUE discussed the arrest of a drug customer</u>

235.    On April 30, 2021, at 1:58 p.m., CUE, who was using Target Telephone 3, called MENARD, who was using the MENARD Telephone. MENARD and CUE discussed a customer who was recently arrested. MENARD stated, "He lasted 8 months, and he got booked this morning. I don't see how they put DCU on his floor." CUE asked, "They put what?" MENARD clarified, "Drug Control Unit. They rented a room on his floor." CUE stated, "That's crazy." MENARD replied, "But you can't tell in downtown. There is nothing but White people. How can you tell this is the police? He was living eight months. You don't know what the f*** is going on. I know when I went to serve him there one time. His crib, like this sh** is bananas."

236.    I believe that MENARD informed CUE that one of his customers was arrested by the Boston Police Drug Control Unit ("He lasted 8 months, and he got booked this morning."). I believe that this individual was MENARD's drug customer because MENARD had been to this customer's home to sell him drugs ("I went to serve him there one time. His crib.").

<u>May 5, 2021: CUE described his firearm on a call and discussed that MENARD and RINVIL</u>

<u>were living at Target Locations 2 and 4, respectively</u>

237.    On May 5, 2021, at 6:41 p.m., CUE, who was using Target Telephone 3, called an unidentified male who was using (857) 417-4271 ("UM-4271"). CUE and UM-4271 were discussing firearms and firearm licenses. CUE stated, "You know I got a 1911 (meaning, a Colt 1911 pistol)." UM-4271 asked, "Oh, the Saur? Silver?" CUE replied, "Stainless steel. Like Marine style." UM-4271 asked, "Is it obliterated or still clean?" CUE asked, "What do you mean?" UM-

4271 answered, "I found a lot of different things." CUE replied, "Yeah. It's brand new. It came from New Hampshire brand new. It has not even been bust (meaning, fired)." I believe that CUE informed UM-4271 that he had a Marine-style, silver Colt 1911 pistol.

238.    CUE continued that JOSEPH let RINVIL live at Target Location 4. CUE stated, "We had the condo, and we ended up getting a two-bedroom apartment. We gave Night the condo, and we been rocking at the two-bedroom apartment."  I believe that CUE informed UM-4271 that MENARD was now living at Target Location 2 and that he and JOSEPH rented a second stash location at Target Location 4 where they sell drugs ("rocking"). I know that CUE is not licensed to own a firearm and that his criminal history prohibits him from possessing a firearm. I believe that CUE possesses a firearm to protect himself during drug deals and his drug stash.

<u>May 6, 2021: CUE brokered a drug deal between AUGUSTIN and UM-8243</u>

239.    On May 6, 2021, at 9:36 a.m., an unidentified male who was using (617) 307-8243 ("UM-8243"), called CUE, who was using Target Telephone 3. UM-8243 stated, "Getting ready to come up there on May 19th. I'm seeing if you can get the ball moving, like soon, before I get up there." CUE asked, "What does he want?" UM-8243 replied, "I mean I start off with one just to get it moving until I get out there." CUE replied, "How much would your boy want now?" UM-8243 stated, "Just one for now until I get up there to see if it... By the time I get up there it's going good, I'd probably be ready to get. Brought a whole thing." CUE asked, "One or 100?" UM-8243 stated, "You know what I mean by one." CUE replied, "Yeah, alright. I'm just making sure." In a follow-up call, CUE directed UM-8243 to send his "boy" to "the apartment" at 12:00 p.m. and provided the address for Target Location 4.

240.    At 12:01 p.m., the GPS device attached to CUE's BMW X5 showed that it parked outside the building of Target Location 4. Video surveillance showed CUE enter the building with

an individual later identified as AUGUSTIN. Between 12:39 p.m. and 1:00 p.m., CUE and UM-8243 exchanged phone calls wherein CUE complained that UM-8243's courier was late. At 12:39 p.m., UM-8243 called CUE. CUE stated, "I got to go to work… He got people to see, too." I believe that CUE was brokering a drug deal between AUGUSTIN and UM-8243 and that they were waiting for UM-8243's "boy" at the stash location. Around this date, other intercepted calls indicated that CUE's supply of cocaine was bad quality and he received numerous complaints from customers. Thus, I believe CUE needed to broker a deal with UM-8243 with AUGUSTIN's supply of cocaine.

241.    At 12:46 p.m., UM-8243 called CUE. CUE stated, "He's about to leave, and your man is about to just be assed out." CUE continued, "I got to go to work. He got things to do. We've both been sitting here getting on each other's nerves." I believe that CUE informed UM-8243 that he and AUGUSTIN were losing their patience waiting for the drug deal to happen. UM-8243 later informed CUE that his courier was driving a gray Audi A6. At 1:00 p.m., CUE called UM-8243. CUE asked, "He has all the money banded up?" UM-8243 replied, "He should, man. Just make sure the count is right so that way he's just in and out and go." CUE asked, "What did you tell him?" UM-8243 replied, "You said 12." I believe that CUE asked UM-8243 if his courier would provide the money to CUE and AUGUSTIN "banded" up, slang meaning, bundled into $1,000 increments for easy counting. I believe that UM-8243 sent his courier to purchase $12,000 worth of cocaine from CUE and AUGUSTIN.

242.    At 1:03 p.m., investigators observed a gray Audi A6 arrive outside the building of Target Location 4. The male driver exited the vehicle and entered the building. At 1:08 p.m., the driver left the building, entered the gray Audi A6, and left the area. I believe that UM-8243's courier completed the drug deal with AUGUSTIN and CUE inside Target Location 4. At 1:11

p.m., CUE and AUGUSTIN exited the building, entered their respective vehicles, and departed the area.

243.    AUGUSTIN entered a rented Dodge Journey and drove to an auto sales and repair shop in Abington. The Dodge Journey was rented by an individual associated with AUGUSTIN through a motor vehicle insurance claim. AUGUSTIN had filed a motor vehicle insurance claim on February 5, 2021, listing his telephone number as (347) 417-2512 (the "AUGUSTIN Telephone") and his address as Target Location 6.[25]

244.    On May 14, 2021, CUE, who was using Target Telephone 3, called AUGUSTIN, who was using the AUGUSTIN Telephone, on two occasions. During the first call, CUE stated, "See, there is no way that I'm doing any funny stuff. Let me call him. Hold on. Put your phone on mute." The call then abruptly ended. During the second call, CUE stated, "Hold on. Be quiet. Let me call this dude." The call then again abruptly ended. I believe that CUE called AUGUSTIN to get his attention, but then quickly switched to an encrypted application to continue their conversation. I believe that CUE and AUGUSTIN are drug traffickers and CUE needed AUGUSTIN's supply of cocaine when CUE's supply was generating complaints.

<u>May 19, 2021: CUE met AUGUSTIN outside Target Location 6</u>

245.    On May 19, 2021, investigators established surveillance in the area of Target Location 6. At 7:16 p.m., surveillance officers observed the Dodge Journey, used by AUGUSTIN on May 6, 2021, leave from Target Location 6. At 7:28 p.m., investigators identified AUGUSTIN standing outside the Dodge Journey with two other individuals on Thurber Avenue in Brockton. At 10:07 p.m., investigators observed CUE's BMW X5 parked outside of Target Location 6.

---

[25] AUGUSTIN is also the subscriber to the AUGUSTIN Telephone.

Investigators observed AUGUSTIN exit the building of Target Location 6 and enter CUE's vehicle. The GPS device attached to CUE's vehicle then showed the vehicle made a brief stop outside 3 Desmond Road in Randolph before going to CUE's workplace in Woburn. I believe that CUE picking up AUGUSTIN at Target Location 6 confirms that AUGUSTIN resides at that address.

### May 14, 2021: CUE informed JOSEPH that he supplied MENARD with a half kilogram of cocaine

246.    On May 14, 2021, at 7:55 a.m., CUE, who was using Target Telephone 3, called JOSEPH, who was using Target Telephone 1. During the start of the call JOSEPH and CUE discussed MENARD's sister dying and MENARD hanging out with women. JOSEPH stated, "That man still owes for the rent." CUE stated, "I thought he was clear this month." JOSEPH replied, "He gave me 800." CUE stated, "Oh, he made it seem like he paid rent. Damn, it's about to be the first again." JOSEPH stated, "He gave me 800. Said you robbed him." CUE asked, "I robbed him?" JOSEPH stated, "Yeah." CUE replied, "He paid me." JOSEPH asked, "What?" CUE stated, "Listen, this is the thing. He came through, to get a halftime… He came through and was like, 'Oh, let me get a half.' I'm like, 'Alright, cool.' But I didn't even have that. I gave him whatever I had." JOSEPH and CUE continued to discuss that MENARD owed JOSEPH rent.

247.    I believe that MENARD asked CUE for a half kilogram of cocaine ("He came through... to get a halftime… He came through and was like, 'Oh, let me get a half.'"). I believe that CUE did not have the half kilogram so he supplied MENARD with what he had available ("But I didn't even have that. I gave him whatever I had."). I believe that MENARD owed JOSEPH rent for living at Target Location 2.

<u>March 30, 2021: SNOW arranged a drug deal with CUE because his supply was low and his customers were waiting</u>

248.    On March 30, 2021, at 8:56 p.m., SNOW, who was using (774) 209-0003,[26] sent a text message to CUE, who was using Target Telephone 3. In response, CUE called SNOW. SNOW asked to meet CUE that night to buy cocaine. SNOW stated, "Tonight. I haven't touched that other pack because I'm still working on my pack I had. That's almost gone. This one, I got like 26. I got 26 for you." CUE told SNOW he was at work and agreed to meet him at midnight when CUE was available. SNOW stated, "I haven't slept yet. I just pieced everything out, and it's still going. I got nothing right now. Just ran out. The dudes got their check money and their stimulus. You know what I mean? I'm trying to stay on top of that."

249.    I believe that SNOW informed CUE that he had $2,600 to purchase cocaine from CUE ("I got 26 for you."). Two ounces of cocaine have an approximate street value of $2,600. I believe that SNOW stated that he was busy selling drugs, just sold everything he had and still had customers calling ("I haven't slept yet. I just pieced everything out, and it's still going. I got nothing right now. Just ran out."). I believe that SNOW's customers recently received COVID stimulus checks, so SNOW was trying to make sales to his customers while they had money ("The

---

[26] In November 2020, investigators received information from a local police department that a confidential informant ("CI-1") provided information that SNOW is a cocaine and fentanyl distributor operating in the Cape Cod area of Massachusetts. CI-1 has purchased narcotics from SNOW in the past using telephone number (774) 209-0003. Telephone number (774) 209-0003 is subscribed to SNOW and in a motor vehicle accident claim in 2014, SNOW provided his contact telephone number as (774) 209-0003. CI-1 has a criminal history including drug-related convictions. CI-1 was cooperating with local law enforcement for consideration in criminal motor vehicle offenses. CI-1 has provided information in the past that has resulted in the seizure of narcotics for this local police department. Based on my conversations with detectives who have spoken directly with CI-1, investigators believe that information from CI-1 is reliable.

dudes got their check money and their stimulus… I'm trying to stay on top of that."). Based on the late hour of CUE and SNOW's drug deal, investigators were unavailable to surveil their meeting.

May 19, 2021: Investigators seized cocaine and cocaine base from SNOW after a drug deal with

CUE at Target Location 4

250.    On May 19, 2021, at 1:25 p.m., SNOW, who was using (508) 737-7640,[27] called CUE, who was using Target Telephone 3. SNOW stated, "I'm here. I'm good to go. I got 11 total." CUE replied, "I'm trying to figure out what I can even do." At that time, investigators observed SNOW arrive as a passenger in a Ford Explorer outside the building for Target Location 4. Investigators observed CUE meet with SNOW in the parking lot for a brief exchange. Believing that SNOW provided $1,100 to CUE in exchange for cocaine, officers followed the Ford Explorer out of the area of Target Location 4 ("I got 11 total.").

251.    The Ford Explorer travelled to the Columbia Road exit on Route 93 North in Dorchester. An investigator on this case, in his MSP uniform and a marked police vehicle, stopped the Ford Explorer at the end of the off-ramp. SNOW was a passenger in the vehicle, which was also occupied by a female driver, another male passenger, and two children. Another investigator on this case also joined the Trooper during the stop. Believing that SNOW had met with CUE for a drug deal, the Trooper asked SNOW to exit the vehicle to further his investigation. Upon a pat frisk of SNOW's groin area, the other investigator felt objects in SNOW's groin area. Based on the investigator's training and experience, and knowledge of the investigation, it was immediately

---

[27] On April 30, 2021, at 2:49 p.m., SNOW used (774) 209-0003 to send a text message to CUE stating, "Hit me ready." At 6:04 p.m., the same day, SNOW sent a text message to CUE that stated, "Hey, it's Pat (meaning, Patrick SNOW) new number." Further, based on the timing of intercepted calls, surveillance, SNOW's arrest, and follow-up call to CUE after his arrest, I believe that SNOW is the user of (508) 737-7640.

apparent to the investigator that the objects were plastic bags containing controlled substances. The investigator asked SNOW to remove the objects, and SNOW produced one bag of suspected cocaine and a smaller bag of suspected cocaine base. The Trooper seized the drugs and informed SNOW that he would receive a summons in the mail (a ruse to preserve the integrity of the investigation). The larger bag weighed approximately 26 grams and field tested positive for cocaine. The smaller bag weighed approximately 12 grams and field tested positive for cocaine base. The suspected cocaine and cocaine base was secured by investigators and will be transferred to the MSP Crime Laboratory for confirmatory analysis.

252.    Later that day, at 4:58 p.m., SNOW sent a text message to CUE stating, "Yo, I got popped." CUE immediately called SNOW. SNOW stated, "I got popped in Dorchester. They let me go. I think it's this dude's girl… I'm giving you a heads up, bro. I didn't say sh**… But they let me go because of COVID." SNOW continued to assure CUE that he did not cooperate with the police and that he would get more money to buy drugs from CUE again. I believe that SNOW called CUE to inform him that he was stopped by the police ("Yo, I got popped."). I believe that SNOW suspected the female driver of cooperating with law enforcement, but assured CUE that he was not cooperating ("I think it's this dude's girl… I'm giving you a heads up, bro. I didn't say sh**.").

### May 20, 2021: JOSEPH explained how he facilitated shipment of kilograms of cocaine from the Dominican Republic to Puerto Rico to Massachusetts

253.    On May 20, 2021, at 3:22 p.m., an unidentified male who was using (617) 922-3137 ("UM-3137") called JOSEPH, who was using Target Telephone 1. UM-3137 stated, "I might need your help." JOSEPH asked, "What's going on?" UM-3137 stated, "To get from the other side." JOSEPH asked, "Which side?" UM-3137 stated, "D.R." JOSEPH asked, "What do you

need?" UM-3137 stated, "One." JOSEPH replied, "They're not going to waste their time on that." UM-3137 stated, "How much can they bring over?" JOSEPH replied, "You must have at least 15, 20." UM-3137 asked, "How much is the fee?" In the background, UM-3137 was overheard asking someone else, "Do you think the person can bring 10 over?" JOSEPH stated, "This guy is a friend of mine. This guy, he lives over there now. He is the one who is always sending over to me from over there." UM-3137 asked, "If I send out to him, can't he still send it over to you?" An unidentified male present with UM-3137 stated, "How about five? Can't you send over five?" JOSEPH replied, "This guy won't do five. The minimum he would do is 10. Then you will get them in pairs because they come from over there and go to P.R. Then they can come over." UM-3137 stated, "Alright, I'll keep you posted."

254.    I believe the following about the above-mentioned intercepted call: JOSEPH explained his drug trafficking conspiracy to UM-3137. UM-3137 asked in Haitian Creole about getting a kilogram of cocaine ("one") from the Dominican Republic ("other side… D.R."). JOSEPH explained that he has a friend that lives in the Dominican Republic who is sending kilograms of cocaine to him in Massachusetts but will only sell a minimum of 10 kilograms to be shipped to Massachusetts ("This guy is a friend of mine. This guy, he lives over there now. He is the one who is always sending over to me from over there… The minimum he would do is 10."). I have identified IP addresses tracking suspicious parcels connected to this investigation originating from the Dominican Republic, which corroborates JOSEPH's statement. JOSEPH explained that the kilograms of cocaine come shipped in pairs ("Then you will get them in pairs."). This is consistent with the seized cocaine parcels that each contained two individually-wrapped kilograms of cocaine. JOSEPH further explained that the kilograms of cocaine are sent to Puerto

Rico and then shipped to Massachusetts ("They come from over there and go to P.R. Then they can come over.").

Request for No Knock Warrant for Target Location 4

255.    As discussed above, Target Location 4 is a stash location used by JOSEPH and CUE. As further discussed above, CUE described that he owns a firearm. As stated above, I believe that CUE may have that firearm to protect his stash location and may keep that firearm at the stash location. Further, RINVIL is the current resident of Target Location 4. As discussed above, RINVIL has discussed with CUE, his desire to rob other drug dealers. RINVIL is currently on parole following a conviction for manslaughter related to a fatal shooting in New York. I believe that RIVIL has incentive to destroy drug evidence if alerted of police presence and if alerted to police presence would be a danger to officers executing the warrant at Target Location 4 given his violent criminal history and potential access to a firearm at a stash location. Further, the entryway to Target Location 4 is located on the third floor of a multi-unit apartment building. Should officers encounter violence after knocking and announcing, I believe that it would be difficult for officers to retreat from outside Target Location 4, posing a great risk of harm to officers executing the warrant.

## DRUG TRAFFICKERS' USE OF RESIDENCES, STASH LOCATIONS, AND CELLULAR TELEPHONES

256.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and

distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

257.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences and stash locations of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences or stash locations records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences or stash locations for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

258.    Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts. Investigators have

intercepted communications between JOSEPH and U-Haul discussing his storage unit. Investigators have not yet identified the location of JOSEPH's storage unit, but I believe he may keep records of his storage unit at his residence or stash locations.

259.   Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences or stash locations either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

260.   Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences or stash locations. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

261.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

262.     Finally, as noted above, evidence of drug crimes can be found in cell phones and smart phones. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1 through B-13 on their cellular telephones.

263.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can often be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

264.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.

Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

265.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the

file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

266.     I know from my training and experience, that many cellular telephones now offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called a biometric lock.

267.     If a user enables the biometric lock, he or she can register fingerprint(s) that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's fingerprint sensor.  In my training and experience, users of biometric locks often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

268.     In some circumstances, a fingerprint cannot be used to unlock a device that has a biometric lock enabled, and a passcode must be used instead, for example, if the device has not been unlocked for a period of time, or due to a periodic requirement to use the passcode.  Thus, in the event law enforcement encounters a locked smartphone device, the opportunity to unlock the device via the fingerprint sensor exists only for a short time.  A biometric lock may also not work to unlock the device if for example, (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) several unsuccessful attempts to unlock the device are made.

269.     I am also aware that even more recent smartphone devices no longer use a biometric lock and instead use a facial recognition security feature. Facial recognition systems use the

smartphone's camera to scan the face of the user and, if the scan matches the data on file, performs actions like unlocking the smartphone.

270.    The passcodes that would unlock these devices are not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's fingerprint sensor or use the device's camera to access the facial recognition security feature in an attempt to unlock the device for the purpose of executing the search authorized by these warrants.  Attempting to unlock the device with the use of the fingerprints of the user or use of the device's camera and take a scan of the user is necessary because the government may not otherwise be able to access the data contained on the device for the purpose of executing the search authorized by these warrants.

271.    Based on the facts discussed in this affidavit, I believe that the Target Defendants use cellular telephones to communicate about the Target Offenses. Investigators intend to call the known telephone numbers of the Target Defendants and residents of the Target Locations when searching the Target Locations. If a smartphone device rings, and the Target Defendant or resident is present, I request authority to place his finger(s) on the fingerprint sensor, if one exists, to unlock the device and/or use the camera on the device to scan the Target Defendant or resident's face to unlock the smartphone.

272.    I have participated in the execution of numerous search warrants at the residences and stash locations of drug traffickers similar to the Target Defendants. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

        a.   controlled substances;

b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, and inositol;

c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane

tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

273.  Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Defendants are engaged in the Target Offenses.  I believe that evidence of their drug trafficking offenses will be found inside each of the Target Locations and on certain cellular telephones seized therefrom.

## **CONCLUSION**

274.    Based on the information set forth above, I believe probable cause exists to conclude that the Target Defendants have conspired and continue to conspire to distribute and possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846, and that evidence of said criminal offenses, as set forth in Attachments B-1 through B-12 of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

275.    Because the complaint, warrants and accompanying affidavit, and applications in support thereof reveal an ongoing investigation, it is further requested that the complaint, warrants and accompanying affidavit, and applications be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the complaint and warrants in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Inspectors, Task Force Officers, and other investigative and law enforcement officers of the USPIS, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative law enforcement officers, as necessary to effectuate the warrants.

276.    I, Jeffrey M. Powers, having sworn to this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,



/s/ Jeffrey M. Powers

_____
JEFFREY M. POWERS
POSTAL INSPECTOR
UNITED STATES POSTAL INSPECTION
SERVICE

Attested and sworn to telephonically in accordance with Fed. R. Crim. P. 4.1 on May 26, 2020.

HON. M. PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

**ATTACHMENT A-1**

**(Location to be searched)**

85 Murray Circle, Stoughton, Massachusetts ("Target Location 1") is a single-family residence, with gray siding and white trim. There is a paved driveway located to the left of the residence leading to a porch and door at the left side of the residence. The front door to the residence is yellow and the number "85" in black is affixed to the left of the front door of the residence.  There is also a back door to the residence and entry is gained from a back porch. A photograph of Target Location 1 is attached.



## ATTACHMENT A-2

### (Location to be searched)

1 Royal Crest Drive, Unit 4C, Randolph, Massachusetts ("Target Location 2") is an apartment in a multi-unit apartment building, with brick and beige siding. There are two doors to 1 Royal Crest Drive, front and back. Both doors are brown and the number "1" in gold is affixed above and in the middle of both doors to 1 Royal Crest Drive. Unit 4C is located on the lower level of 1 Royal Crest Drive. Once inside the building, the brown door to unit 4C does not have any identification on the apartment door. All 11 other units inside the building contain a unit number on their respective doors. Target Location 2 is the only apartment door in the building missing a label. Photographs of the front and back doors of the building at Target Location 2 and the door to Target Location 2 are attached.

 



2

**ATTACHMENT A-3**

**(Location to be searched)**

100 Liberty Place, Apartment 23E, Randolph, Massachusetts ("Target Location 3") is an apartment inside a multi-unit apartment building, with beige siding and white trim. The front door to Building 23 at 100 Liberty Place is white and glass. The number "23" in gold is affixed above the front door. Once inside Building 23, the doors to Apartments A-D are labeled. The black door to Unit E is the only door in the building not identified by a label. Photographs of Target Location 3 are attached.





**ATTACHMENT A-4**

**(Location to be searched)**

100 Liberty Place, Apartment 13E, Randolph, Massachusetts ("Target Location 4") is an apartment in a multi-unit apartment building, with beige siding and white trim. The front door to Building 13 at 100 Liberty Place is white and glass, The number "13" in gold is affixed above the front door. Once inside Building 13, the black door to unit E is identified with the letter "E" in the center of the door in gold. Photographs of Target Location 4 are attached.





**ATTACHMENT A-5**

**(Location to be searched)**

22 Green Street, Right Side, Randolph, Massachusetts ("Target Location 5") is a two-family residence, with brick siding and white trim. There is a paved driveway located to the left and rear right of the residence.  The front storm door to the residence is white and the second door is black.  The number "22" is on the black mailbox to the left of the front door in white. There are also back doors to the residence. Photographs of the front and rear doors of Target Location 5 are attached. The rear entrance to Target Location 5 is circled in yellow.





**ATTACHMENT A-6**

**(Location to be searched)**

100 Highland Street, Apartment 2, Brockton, Massachusetts ("Target Location 6") is an apartment in a multi-unit residence, with blue gray siding and white trim. The front storm door to the residence is white. The number "100" is above the front door in black. There is also a side door on the left of the residence. A photograph of the front door of the residence of Target Location 6 is attached.



**ATTACHMENT A-7**

**(Location to be searched)**

33 Davison Street, Apartment 1F, Hyde Park, Massachusetts ("Target Location 7") is an apartment in a multi-family residence, with off-white siding and white trim. There is a paved driveway located to the right of the residence.  The front door to the residence is brown.  The number "33" is in the center of the two front doors in gold. A photograph of the front door of the residence of Target Location 7 is attached. The door to Target Location 7 is circled in yellow.



**ATTACHMENT A-8**

**(Location to be searched)**

1 Webster Avenue, Apartment 201, Chelsea, Massachusetts ("Target Location 8") is an

apartment in a multi-unit apartment building, with beige and tan siding. The main entrance to the

building is made of glass. There is also a set of rear glass doors. Once inside the main door,

Apartment 201 is on the second floor and is identified with "201" in black affixed to the left of

the black door to Apartment 201.  Photographs of Target Location 8 are attached.





**ATTACHMENT A-9**

**(Location to be searched)**

91 Highland Street, Apartment 1, Brockton, Massachusetts ("Target Location 9") is an apartment

in a multi-unit apartment building, with gray siding and white trim. Entry to the left side door to

the building is gained through a side porch. Once inside the main door, Apartment 1 is on the first

floor. A photograph of the side door of the building of Target Location 9 is attached.



**ATTACHMENT A-10**

**(Location to be searched)**

152 Spencer Street, Apartment 3, Dorchester, Massachusetts ("Target Location 10") is a

is an apartment in a multi-family residence, with yellow siding and brown trim. The front door to

the residence is brown. The number "152" is located to the left of the front door in black.

Apartment 3 is on the third floor. A photograph of the front door of the residence of Target

Location 10 is attached.



**ATTACHMENT A-11**

**(Location to be searched)**

32 Merrymount Avenue, Apartment 8, Quincy, Massachusetts ("Target Location 11") is an apartment in a multi-unit apartment building, with brick siding and white trim. The number "32" is affixed to the right of the white front door in silver numerals. Apartment 8 is on the first floor and is identified with the number "8" in black.  Photographs of Target Location 11 are attached.





**ATTACHMENT A-12**

**(Location to be searched)**

79 Peckham Street, Apartment 3, Fall River, Massachusetts ("Target Location 12") is an apartment in a multi-unit apartment building, with beige siding and white trim. The number "79" is affixed to the center of the tan door on the left side of the building in black numerals. Apartment 3 is on the third floor. A photograph of the building of Target Location 12 is attached. The door to the building of Target Location 12 is circled in yellow.



**ATTACHMENT B-1**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 1. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.      Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.      Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Patrick Joseph, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a.      Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.      Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.      Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.      Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e.      Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.      Any GPS data;

   g.      Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h.      Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

14

k.      During the search of Target Location 1, law enforcement personnel are authorized to press the fingers (including thumbs) of Patrick Joseph to the telephone bearing call number (617) 676-7827 to the fingerprint sensor of the device found at Target Location 1 and/or use the camera of the cellular telephone to scan the face of Patrick Joseph for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-2**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1.    Controlled substances, including cocaine and cocaine base;

2.    Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants;

3.    Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

5.    Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6.    Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

7.     Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 2.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.     Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.     Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Night Menard, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a.     Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.     Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.     Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.     Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e.     Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.     Any GPS data;

   g.     Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h.     Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug

17

trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.   Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.   During the search of Target Location 2, law enforcement personnel are authorized to press the fingers (including thumbs) of Night Menard to the telephone bearing call number (857) 318-9807 to the fingerprint sensor of the device found at Target Location 2 and/or use the camera of the cellular telephone to scan the face of Night Menard for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-3**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1. Controlled substances, including cocaine and cocaine base;

2. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants;

3. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

5. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

7.     Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 3. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.     Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.     Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Christian Junior Alvarado-Deleon or Oscar Nieves-Sosa, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a.     Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.     Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.     Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.     Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e.     Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.     Any GPS data;

   g.     Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h.     Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug

20

trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.      During the search of Target Location 3, law enforcement personnel are authorized to press the fingers (including thumbs) of Christian Junior Alvarado-Deleon to the telephone bearing call number (646) 267-6689 to the fingerprint sensor of the device found at Target Location 3 and/or use the camera of the cellular telephone to scan the face of Christian Junior Alvarado-Deleon for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

l.      During the search of Target Location 3, law enforcement personnel are authorized to press the fingers (including thumbs) of Christian Junior Alvarado-Deleon to the telephone bearing call number (929) 538-9803 to the fingerprint sensor of the device found at Target Location 3 and/or use the camera of the cellular telephone to scan the face of Christian Junior Alvarado-Deleon for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

m.     During the search of Target Location 3, law enforcement personnel are authorized to press the fingers (including thumbs) of Oscar Nieves-Sosa to the telephone bearing call number (570) 599-9013 to the fingerprint sensor of the device found at Target Location 3 and/or use the camera of the cellular telephone to scan the face of Oscar Nieves-Sosa for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-4**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1. Controlled substances, including cocaine and cocaine base;

2. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants;

3. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

5. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

7.     Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 4. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.     Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.     Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Patrick Joseph, Patrick Rinvil, or Patrick Joseph, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

    a.     Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

    b.     Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c.     Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

    d.     Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

    e.     Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

    f.     Any GPS data;

    g.     Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

    h.     Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug

trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.      During the search of Target Location 4, law enforcement personnel are authorized to press the fingers (including thumbs) of Patrick Joseph to the telephone bearing call number (617) 676-7827 to the fingerprint sensor of the device found at Target Location 4 and/or use the camera of the cellular telephone to scan the face of Patrick Joseph for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

l.      During the search of Target Location 4, law enforcement personnel are authorized to press the fingers (including thumbs) of Patrick Rinvil to the telephone bearing call number (646) 240-5295 to the fingerprint sensor of the device found at Target Location 4 and/or use the camera of the cellular telephone to scan the face of Patrick Rinvil for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

m.      During the search of Target Location 4, law enforcement personnel are authorized to press the fingers (including thumbs) of Donald Cue to the telephone bearing call number (617) 504-8837 to the fingerprint sensor of the device found at Target Location 4 and/or use the camera of the cellular telephone to scan the face of Donald Cue for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-5**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 5. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.  Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.  Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Donald Cue, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a.  Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.  Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.  Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.  Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e.  Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.  Any GPS data;

   g.  Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h.  Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   i.  All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   j.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.     During the search of Target Location 5, law enforcement personnel are authorized to press the fingers (including thumbs) of Donald Cue to the telephone bearing call number (617) 504-8837 to the fingerprint sensor of the device found at Target Location 5 and/or use the camera of the cellular telephone to scan the face of Donald Cue for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-6**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1.     Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3.     Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.     Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5.     Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 6.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.      Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.      Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Charnee Augustin, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

      a.      Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

      b.      Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

      c.      Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

      d.      Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

      e.      Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

      f.      Any GPS data;

      g.      Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

      h.      Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

      i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

      j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.    During the search of Target Location 6, law enforcement personnel are authorized to press the fingers (including thumbs) of Charnee Augustin to the telephone bearing call number (347) 417-2512 to the fingerprint sensor of the device found at Target Location 6 and/or use the camera of the cellular telephone to scan the face of Charnee Augustin for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-7**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1.  Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.  Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5.  Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 7.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.      Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.      Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Oscar Nieves-Sosa, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a.      Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.      Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.      Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.      Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e.      Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.      Any GPS data;

   g.      Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h.      Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

32

    k.        During the search of Target Location 7, law enforcement personnel are authorized to press the fingers (including thumbs) of Oscar Nieves-Sosa to the telephone bearing call number (570) 599-9013 to the fingerprint sensor of the device found at Target Location 7 and/or use the camera of the cellular telephone to scan the face of Oscar Nieves-Sosa for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-8**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1.      Controlled substances, including cocaine;

2.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants;

3.      Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

5.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6.      Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

7. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 8. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8. Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9. Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Stiven Berrio Osorio, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a. Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b. Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d. Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e. Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f. Any GPS data;

   g. Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h. Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug

trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.     During the search of Target Location 8, law enforcement personnel are authorized to press the fingers (including thumbs) of Stiven Berrio Osorio to the fingerprint sensor of the device(s) found at Target Location 8 reasonably believed to belong to Stiven Berrio Osorio and/or use the camera of the cellular telephone(s) to scan the face of Stiven Berrio Osorio for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by the warrant.

**ATTACHMENT B-9**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 9.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.   Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.   Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Robert Monteiro and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

a.   Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

b.   Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.   Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

d.   Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

e.   Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

f.   Any GPS data;

g.   Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.   Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.   Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.     During the search of Target Location 9, law enforcement personnel are authorized to press the fingers (including thumbs) of Robert Monteiro to the telephone bearing call number (305) 801-7744 to the fingerprint sensor of the device found at Target Location 9 and/or use the camera of the cellular telephone to scan the face of Robert Monteiro for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-10**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 10. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.      Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.      Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Richard Archie, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a.      Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.      Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.      Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.      Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e.      Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.      Any GPS data;

   g.      Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h.      Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.      During the search of Target Location 10, law enforcement personnel are authorized to press the fingers (including thumbs) of Richard Archie to the telephone bearing call number (857) 247-2728 to the fingerprint sensor of the device found at Target Location 10 and/or use the camera of the cellular telephone to scan the face of Richard Archie for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-11**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 11. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.    Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.    Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Kevon Hackett, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

   a.    Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.    Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.    Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.    Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   e.    Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.    Any GPS data;

   g.    Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   h.    Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   i.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   j.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.      During the search of Target Location 11, law enforcement personnel are authorized to press the fingers (including thumbs) of Kevon Hackett to the telephone bearing call number (617) 581-2561 to the fingerprint sensor of the device found at Target Location 11 and/or use the camera of the cellular telephone to scan the face of Kevon Hackett for the purpose of attempting to unlock the device in order to search the contents as authorized by the warrant.

**ATTACHMENT B-12**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses") from January 1, 2019 to present:

1.  Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include telephone address books; planners; notes; ledgers; and telephone bills.

3.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.  Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5.  Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 12.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.    Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.    Cellular telephones, computers, and other electronic storage media, reasonably believed to belong to Sharod Hopkins, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including:

 a.    Names and contact information that have been programmed into the device(s) (including contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

 b.    Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

 c.    Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

 d.    Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

 e.    Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

 f.    Any GPS data;

 g.    Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

 h.    Any documents, photographs, or videos in any format, including Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

 i.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

 j.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

k.      During the search of Target Location 12, law enforcement personnel are
        authorized to press the fingers (including thumbs) of Sharod Hopkins to
        the telephone bearing call number (617) 318-7157 to the fingerprint sensor
        of the device found at Target Location 12 and/or use the camera of the
        cellular telephone to scan the face of Sharod Hopkins for the purpose of
        attempting to unlock the device in order to search the contents as
        authorized by the warrant.

48